**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VALARIS PLC, *et al.*,[1] | ) | Case No. 20-34114 (MI) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF**

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON AUGUST 20, 2020 AT 2:00 PM IN COURTROOM 404, 4TH FLOOR, 515 RUSK AVENUE, HOUSTON, TX 77002. YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AUDIO/VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT (832) 917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE ISGUR'S CONFERENCE ROOM NUMBER IS 954554.**

**YOU MAY VIEW VIDEO VIA GOTOMEETING. TO USE GOTOMEETING, THE COURT RECOMMENDS THAT YOU DOWNLOAD THE FREE GOTOMEETING APPLICATION. TO CONNECT, YOU SHOULD ENTER THE MEETING CODE "JUDGEISGUR" IN THE GOTOMEETING APP OR CLICK THE LINK ON JUDGE ISGUR'S HOME PAGE ON THE SOUTHERN DISTRICT OF TEXAS WEBSITE. ONCE CONNECTED, CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF THE HEARING. TO MAKE YOUR ELECTRONIC APPEARANCE, GO TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE AND SELECT "BANKRUPTCY COURT" FROM THE TOP MENU. SELECT "JUDGES' PROCEDURES," THEN "VIEW HOME PAGE" FOR JUDGE ISGUR. UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE". SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.stretto.com/Valaris. The location of Debtor Ensco Incorporated's principal place of business and the Debtors' service address in these chapter 11 cases is 5847 San Felipe Street, Suite 3300, Houston, Texas 77057.

**RELIEF IS REQUESTED NOT LATER THAN AUGUST 20, 2020.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion (this "Motion").

## Relief Requested

1. The Debtors seek entry of interim and final orders, substantially in the attached forms (the "Interim Order" and "Final Order"), (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses and (ii) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto and (b) granting related relief.

2. In addition, the Debtors request that the Court (as defined below) schedule a final hearing approximately 21 days after the commencement of these chapter 11 cases, or as soon thereafter as is convenient for the Court, to consider approval of this Motion on a final basis.

### I. The Interim Order.

3. To minimize disruption to the Debtors' businesses, the Debtors request the authority to make payments related to the Employee Compensation and Benefits that become payable during the period between the Petition Date and entry of the Final Order (the "Interim Period") as set forth herein and to continue to honor the Employee Compensation and Benefits obligations after the Petition Date in the ordinary course of business on a postpetition basis and in a manner consistent with the Debtors' prepetition policies and procedures. The Debtors do not believe that any individual holder of a priority claim under section 507(a)(4) of the Bankruptcy Code will receive in the aggregate a payment in excess of $13,650 on account of such claim in the Interim Period.

4. To enable the Debtors to carry out the relief requested, the Debtors request that the Court: (a) authorize all applicable banks and financial institutions to receive, process, honor, and

pay all checks presented for payment and all electronic fund transfer requests made by the Debtors related to the Employee Compensation and Benefits, whether such checks were presented or electronic fund transfer requests were submitted before or after the date hereof; and (b) modify the automatic stay to the extent necessary to permit the relief requested in this motion with respect to the Debtors' Workers' Compensation Program and the Maintenance and Cure Claims (each as defined herein).

## II. The Final Order.

5. In addition, at the hearing to approve the Final Order, the Debtors will seek entry of the Final Order, authorizing the Debtors to continue to honor the Employee Compensation and Obligations in the ordinary course of business and in a manner consistent with the Debtors' prepetition policies, and to honor, pay, satisfy, or remit in the ordinary course of business and in accordance with the Debtors' prepetition policies and programs, all prepetition amounts outstanding on account of the following Employee Compensation and Benefits obligations. The Debtors' estimates as of the Petition Date the Employee Compensation and Benefits obligations are as set forth below.

| Relief Sought | Estimated Amount Due (Interim Period) | Estimated Amount Due (Total) |
|---|---|---|
| **Compensation and Withholding Obligations** | | |
| Unpaid Wages | $12.9 million | $12.9 million |
| Unpaid Independent Contractor Obligations | $1.7 million | $3.5 million |
| Unpaid Withholding Obligations | $13.3 million | $19.8 million |
| Unpaid Employer Taxes | $8.8 million | $22.2 million |
| Payroll Processing Fees | $70,000 | $70,000 |
| Host Country Allowances | $0.9 million | $0.9 million |
| Director Compensation | $0 | $0 |
| Total Compensation and Withholding Obligations | $37.7 million | $59.4 million |
| **Employee Health Benefits and Entitlements** | | |
| Health Insurance Benefits | $4.7 million | $6.0 million |
| Life and AD&D Insurance | $110,000 | $110,000 |
| Disability Benefits | $0.3 million | $1.1 million |
| The Workers' Compensation Programs | $0.4 million | $11.4 million |
| 401(k) Plan | $22,500 | $22,500 |
| Defined Contribution Plans | $0.2 million | $0.2 million |
| Norway Defined Benefit Plans | $1.4 million | $1.4 million |
| Government Sponsored Retirement Plans | $1.3 million | $1.3 million |
| Retiree Health Coverage | $110,000 | $21.7 million |
| Time-Off Benefits | $0 | $0 |
| Location Entitlement Fees and Expenses | $200,000 | $250,000 |
| Total Employee Health Benefits and Entitlements | $8.8 million | $43.5 million |
| **Other Obligations** | | |
| Reimbursable Expenses and Travel Services | $1.7 million | $3.5 million |
| Corporate Card Expenses | $2.9 million | $2.9 million |
| Total Other Obligations | $4.6 million | $6.4 million |
| **Unions** | | |
| Union Dues | $0 | $0 |
| **Supplemental Retirement and Other Benefits (Final Order Only)** | | |
| Incentive and Retention Plans | N/A | $0 |
| Supplemental Retirement Plans | N/A | $39.0 million |
| Legacy Rowan Pension Plan | N/A | $18.5 million |
| Non-Insider Severance Programs | N/A | $20,000 |
| **TOTAL** | **$51.0 million** | **$166.8 million** |

## Jurisdiction and Venue

6. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent, pursuant to

Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

7. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), and 507(a) of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and Rule 9013-1 of the Bankruptcy Local Rules for Southern District of Texas (the "Bankruptcy Local Rules").

**Background**

9. Valaris plc (together with its Debtor and non-Debtor subsidiaries, "Valaris" or the "Company") is a leading provider of offshore contract drilling services to the international oil and gas industry, with drilling operations in nearly every major offshore market, including the Gulf of Mexico, the North Sea, the Middle East, West Africa, Australia, and Southeast Asia. Valaris is now among the most geographically diverse offshore drilling companies, with operations in 24 countries. In total, Valaris plc has 225 subsidiaries, 24 of which are rig-owning entities. Headquartered in London, England, with a corporate office in Houston, the Company employs approximately 3,900 personnel worldwide. The Company's operating revenue for the twelve months that ended December 31, 2019 was approximately $2.05 billion, and, as of the Petition Date, the Company had approximately $7.1 billion in total funded debt obligations.

10. On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Jonathan Baksht, Executive Vice President and Chief Financial Officer of Valaris plc, in Support of the*

*Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"),[2] filed contemporaneously with this Motion and incorporated by reference herein.

11. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

**The Debtors' Workforce**

12. Valaris plc and its Debtor affiliates employ approximately 2,660 employees in as many as 24 countries across the globe at any given time (collectively, the "Employees"). The Employees perform a wide variety of functions critical to the administration of these chapter 11 cases and the Debtors' restructuring. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability, safety, and efficiency. In many instances, the Employees include highly trained personnel who are not easily replaced and who fulfill critical safety roles for the Company. Without the continued, uninterrupted services of their Employees, the Debtors' business operations will be halted.

13. Approximately 2,100 of the Debtors' Employees are employed offshore and are involved in the day-to-day operations of the drilling rigs (collectively, the "Offshore Employees"). The Debtors also employ approximately 560 workers onshore to support the rigs and enterprise-wide operations for the Debtors (collectively, "Onshore Employees"). Onshore

[2] Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration.

Employees typically work in regional offices including those located in the USA (Houston), Brazil, France, Norway, Angola, the UAE (Dubai, Abu Dhabi), Australia, Indonesia, Malaysia, Mexico, Nigeria, Saudi Arabia, Singapore, Thailand, and Qatar.[3] Onshore Employees serving in operational support roles include positions such as rig managers, supply chain managers, IT specialists, and other support staff. Most Onshore Employees are employed by Debtor Ensco Incorporated or the Company's regional services entities like Debtor ENSCO Oceanics International Company. Geographically, these categories of Employees can be summarized as follows:

| | Offshore | Onshore |
|---|---|---|
| North/South America | 1,120 | 80 |
| Europe (North Sea) | 470 | 50 |
| Middle East/Africa/Asia Pacific | 500 | 130 |
| Corporate | 10 | 300 |
| **TOTAL** | **2,100** | **560** |

14. Approximately 590 Employees are members of a labor force union (collectively, "Represented Employees") and are covered by one of eight collective bargaining agreements (the "CBAs") between certain of the Debtors and the unions. Represented Employees are located in Norway, Brazil, Angola, Australia, and France. The Debtors request authority to continue to honor all obligations to Represented Employees under the terms of the existing CBAs to which certain of the Debtors are party.[4]

[3] The Debtors own offices and other facilities in Louisiana, Angola, Australia, and Brazil.

[4] By requesting authority to honor obligations relating to any CBA in this Motion, the Debtors are not assuming or affirming any contracts, agreements, programs, or the applicability of any law related to any CBA and the Debtors reserve all of their rights with regard to any CBA.

15. The Debtors also supplement their workforce from time to time by relying on approximately 1,070 specialized contractors (collectively, the "Independent Contractors"). The Independent Contractors are a critical and cost-effective supplement to the efforts of the Debtors' Employees and typically provide specialized corporate support services or experienced labor on the drilling rigs. Generally, the Independent Contractors are paid directly by the Debtors or their non-Debtor affiliates or through payments to staffing agencies who then pay the Independent Contractors (collectively, the "Contractor Fees"). The staffing agencies' ability to pay the Independent Contractors hinges upon timely receipt of the Contractor Fees from the Debtors.

16. The Employees and Independent Contractors perform a wide variety of functions critical to the Debtors' operations. In many instances, these individuals are highly trained and have an essential working knowledge of the Debtors' business that cannot be easily replaced. Without the continued uninterrupted services of their Employees and Independent Contractors, the Debtors' business operations will be halted and the Debtors' reorganization efforts will be threatened.

## Employee Compensation and Benefits

17. The Debtors maintain the following compensation and benefits programs and pay various administrative fees and premiums in connection therewith (each as defined here, and together, the "Employee Compensation and Benefits"). To minimize disruption to the Debtors' business, the Debtors request the authority to honor prepetition ordinary course obligations on an interim and final basis on account of the Employee Compensation and Benefits below:

- Wages;
- Unpaid Independent Contractor Obligations;
- Unpaid Withholding Obligations;

- Unpaid Employer Taxes;
- Payroll Processing Fees;
- Host Country Allowances;
- Director Compensation;
- Incentive and Retention Plans;
- Health Insurance Benefits;
- Life and AD&D Insurance;
- Disability Benefits;
- the Workers' Compensation Programs;
- Maintenance and Cure Claims;
- 401(k) Plan;
- Defined Contribution Plans;
- Norway Defined Benefit Plans;
- Legacy Rowan Pension Plan;
- Government Sponsored Retirement Plans;
- Supplemental Retirement Plans;
- Retiree Health Coverage Plans;
- Time-Off Benefits;
- Location Entitlement Fees and Expenses;
- Reimbursable Expenses and Travel Services;
- Corporate Card Expenses;
- the Non-Insider Severance Programs; and
- Union Dues.

18. The Debtors seek to continue to honor the Employee Compensation and Benefits provided to Employees postpetition in the ordinary course of business and pay all necessary costs incident to these arrangements.

19. The vast majority of Employees and Independent Contractors rely exclusively on their compensation and benefits to pay their daily living expenses and to support their families. Employees and Independent Contractors will be exposed to significant financial hardships if the Debtors are not permitted to continue paying wages and salaries, providing employee benefits, and maintaining certain programs benefiting Employees in the ordinary course of business. Consequently, the Debtors respectfully submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

## I. Compensation and Withholding Obligations.

### A. Wages.

20. In the ordinary course of business, the Debtors incur payroll obligations for base wages, salaries, and other compensation owed to Employees (the "Wages"). Most of the Employees are paid monthly around the 25th day of the month (*i.e.*, payments distributed in the last week of June 2020 were on account of wages earned in June 2020),[5] except for local U.S. Employees, who are paid bi-weekly in arrears, and Employees based in Mexico, who are paid semi-monthly on the 15th and last day of each month. Depending on where they work, Employees

[5] In certain countries, the Debtors pay an extra month's salary to Employees in November or December of every year (the "13-Month Salary"). Although a 13-Month Salary is traditionally a form of Christmas bonus, the Debtors operate under a Total Reward Principle whereby the Employees are only entitled to their Base Salary as set forth in applicable employment contracts. Accordingly, the normal monthly or bi-weekly payments to Employees receiving 13-Month Salary payments are adjusted downwards to accommodate the extra payment. For the avoidance of doubt, the 13-Month Salary is not a Performance Bonus and the Debtors are not seeking the authority to pay the 13-Month Salary as such. The Debtors request authority to continue to provide the 13-Month Salary in the ordinary course of business and consistent with past practices.

are paid in U.S. dollars, Norwegian kroner, Saudi riyals, and other local currencies. The Debtors fund approximately $30.4 million per month in the aggregate on account of Wages.

21. Because the majority of Employees are paid in arrears, certain Employees are owed accrued but unpaid Wages as of the Petition Date. Wages also may be due and owing as of the Petition Date because of, among other things, (a) potential discrepancies between the amounts paid and the amounts that Employees believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees, (b) the delay between the date when some payroll checks are issued and the date when such checks are presented to an Employee's bank for payment, and (c) unforeseen adjustments to the length of Offshore Employees' duty shifts offshore.

22. As of the Petition Date, the Debtors estimate that they owe Employees approximately $12.9 million in accrued and unpaid Wages (excluding Withholding Obligations, Reimbursable Expenses, Time-Off Benefits, and any payments provided under the Non-Insider Severance Programs) (each as defined herein) (the "Unpaid Wages"), all of which will come due and owing during the Interim Period.

23. By this Motion, the Debtors seek authority to pay in the ordinary course of business the outstanding Unpaid Wages owed to their Employees as of the Petition Date, including any associated costs and fees, and to continue to pay their Employees for postpetition wages and earnings in the ordinary course of business. The Debtors do not believe that the Unpaid Wages with respect to any Employee will exceed the $13,650 priority cap set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. However, to the extent it is later determined by the Debtors that such Unpaid Wages do exceed the $13,650 priority cap, the Debtors seek the authority, out of an abundance of caution, to pay any excess of the cap pursuant solely to the Final Order.

**B. Independent Contractors.**

24. The Debtors retain Independent Contractors either directly, or indirectly through external staffing agencies and labor sub-contractors (the "Staffing Agencies"), and pay them either directly or through the Staffing Agencies. The Employees and the Independent Contractors work side by side with respect to all of the Debtors' business operations, as described above. On average, the Debtors incur approximately $2.0 million per month on account of payments to Independent Contractors.

25. As of the Petition Date, the Debtors estimate that Independent Contractors are owed approximately $3.5 million (the "Unpaid Independent Contractor Obligations") on account of services rendered and Reimbursable Expenses (as defined herein), $1.7 million of which will become due and owing in the Interim Period.

26. The Debtors believe the authority to pay Unpaid Independent Contractor Obligations and to continue paying their Independent Contractors is critical to maintaining and administering their estates. Accordingly, the Debtors seek authority to continue to pay Unpaid Independent Contractor Obligations incurred on account of the Independent Contractors and to continue to make postpetition payments on these obligations in the ordinary course of business.

**C. Withholding Obligations.**

27. The Debtors are required by certain laws to withhold from the U.S. Employees' Wages amounts related to federal, state, and local income taxes, Medicare taxes, Social Security, and state-issued employment insurance (collectively, the "U.S. Employee Payroll Taxes") for remittance to the appropriate federal, state, or local taxing authority. The Debtors also have similar obligations under the laws of the nations in which they operate, for example, the *Fundo de Garantia do Tempo e Serviço* in Brazil (collectively, the "Non-U.S. Employee Payroll Taxes," and together with the U.S. Employee Payroll Taxes, the "Employee Payroll Taxes"). On average, the

Debtors pay and remit approximately $6.2 million per month on account of the Employee Payroll Taxes for Employees.

28. The Debtors also routinely deduct certain amounts from Employees' Wages, including, without limitation, (a) garnishments, child support and service charges, and other similar deductions and (b) other pre- and post-tax deductions payable pursuant to certain of the Employee Health and Welfare Benefits (as defined below), including health insurance premiums and retirement savings contributions, and (c) other withholdings as may be required in the various jurisdictions that the Debtors operate in (collectively, the "Deductions," and together with the Employee Payroll Taxes, the "Withholding Obligations"). On average, the Debtors withhold and remit approximately $9.7 million per month on account of all Deductions.

29. The Debtors estimate that, as of the Petition Date, approximately $19.8 million of accrued but unpaid Withholding Obligations have been deducted but not remitted to the appropriate third-party payees (together, the "Unpaid Withholding Obligations"), $13.3 million of which will become payable in the Interim Period. Moreover, the Debtors believe that the Unpaid Withholding Obligations generally are held in trust by the Debtors and are not property of their estates. As such, the Debtors do not believe they need authority to remit such payments to the appropriate third parties. Out of an abundance of caution, however, the Debtors seek authority to remit any Unpaid Withholding Obligations to the respective third-party payees in the ordinary course of business and to continue to honor and process the Withholding Obligations postpetition.

**D. Employer Payroll Taxes.**

30. In addition to the U.S. Employee Payroll Taxes, the Debtors are required by applicable statutory authority to match from their own funds U.S. Social Security, Medicare taxes, and certain additional amounts for U.S. federal and state unemployment insurance and short-term disability insurance (the "U.S. Employer Payroll Taxes"). The Debtors also have similar

obligations under the laws of certain of the nations in which they operate, for example, personal income taxation in Norway and the *Fundo de Garantia do Tempo e Serviço* in Brazil (collectively, the "Non-U.S. Employer Payroll Taxes," and together with the U.S. Employer Payroll Taxes, the "Employer Payroll Taxes"). On average, the Debtors pay and remit approximately $5.6 million per month on account of the Employer Payroll Taxes.

31. In addition to the Employer Payroll Taxes, the Debtors also make direct tax payments to the relevant taxing authority for certain Expatriate Employees (as defined herein) who are employed outside their country of citizenship (the "Expatriate Payroll Taxes"). The Expatriate Payroll Taxes are not withheld from an individual employee's salary but instead are directly remitted to the relevant taxing authority.[6] Generally, individual Employees are responsible for paying the appropriate taxes in their country of citizenship, although the Debtors make these payments when required by applicable law, such as with the U.S. Payroll Taxes. On average, the Debtors remit approximately $1.4 million per month on account of the Expatriate Payroll Taxes.

32. The Debtors estimate that as of the Petition Date approximately $22.2 million of accrued but unpaid Expatriate Payroll Taxes and Employer Payroll Taxes have not been remitted to the appropriate taxing authorities (the "Unpaid Employer Taxes"), $8.8 million of which will become due in the Interim Period. The Debtors seek authority to remit the Unpaid Employer Taxes and to continue to honor and process the Expatriate Payroll Taxes and Employer Payroll Taxes postpetition in the ordinary course of business and consistent with past practices.

[6] In certain instances, after the Employees file host or home country tax returns, the settlements of Employees' taxes may result in payments due to or from Employees and Valaris.

**E. Payroll Processing Fees.**

33. The Debtors utilize certain payroll servicers (the "Payroll Processors") in order to support payroll processing, payroll tax calculations and filings, retirement savings withdrawals and calculations, garnishment support and filings, check preparation, report writing support, and W-2 form processing (the "Payroll Services") throughout their global operations.

34. Oracle HCM Cloud Payroll is the Debtors' primary Payroll Processor. The Debtors also use other Payroll Processors such as Automatic Data Processing, TMF, and TOTVs (RM Laborre). Generally, the Payroll Processors calculate the amounts owed for certain Withholding Obligations in each applicable payroll period, issue checks to Employees, and remit Payroll Taxes and garnishments to the applicable taxing authorities and third party payees. Each payroll period, the Payroll Processors also calculate the Employee Compensation for each Employee and the Debtors distribute the Employee Compensation to the Employees.

35. On average, the Debtors pay in the aggregate approximately $77,000 per month for the Payroll Services (the "Payroll Processing Fees"). The amount of each monthly Payroll Processing Fee depends on the number of Employees whose Wages and Withholding Obligations are processed during each payroll period. As of the Petition Date, the Debtors estimate they owe approximately $70,000 in the aggregate for Payroll Processing Fees, all of which will become due in the Interim Period.

36. The Payroll Services provided by the Payroll Processors and the Debtors are crucial to the smooth functioning of the Debtors' payroll system because they ensure that Employees are paid on time and that Withholding Obligations are determined appropriately and such amounts are remitted to taxing authorities and other third-party payees. The Debtors seek authority to satisfy any accrued but unpaid prepetition Payroll Processing Fees and continue to pay the Payroll Processing Fees postpetition in the ordinary course of business and consistent with past practices.

**F. Host Country Allowances.**

37. As a result of the international character of the Debtors' operations, the Debtors also provide allowances (the "Host Country Allowances") to certain Employees who have relocated from their home country to a host country in order to work on a company assignment. Some of the Debtors' Employees are required to either relocate permanently to an international location (the "Expatriate Residents") or commute internationally to an offshore rig location (the "Expatriate Rotators" and, together with the Expatriate Residents, the "Expatriate Employees"). Together, approximately 770 employees are considered Expatriate Employees.

38. Depending on their host country and anticipated assignment length, certain Expatriate Employees receive a fixed housing allowance intended to defray or reimburse Employees for the housing they arrange themselves. Other Expatriate Employees are offered a choice of leased accommodations, within a given host country housing budget, with the lease paid for by the Debtors. In addition, certain Expatriate Employees are provided a fixed allowance to address costs associated with utilities, communications, and transportation within the host country. Together, the Debtors pay approximately $1.7 million per month on average to Expatriate Employees on account of the Host Country Allowances.

39. As of the Petition Date, the Debtors believe they owe approximately $0.9 million on account of the aggregate accrued and unpaid Host Country Allowances, all of which will become due in the Interim Period. The Debtors believe that continuation of the Host Country Allowances is essential to remaining competitive in recruiting talented Employees, maintaining Employee morale, and ensuring the uninterrupted continuation of the Debtors' international operations. The Debtors seek authority to pay all outstanding prepetition amounts incurred on account of the Host Country Allowances and to continue to honor the Host Country Allowances

and all costs related thereto postpetition in the ordinary course of business and consistent with past practices.

**G. Non-Employee Director Compensation.**

40. The Debtors maintain several boards of directors which include a total of 11 non-Employees (each, a "Director"). The Directors receive an average annual compensation of $335,000 for their service as Directors, inclusive of amounts received for their service on any committees. Directors are generally paid quarterly in arrears and are also entitled to expense reimbursement for reasonable out-of-pocket expenses in connection with travel related to their Director duties (the "Director Compensation").

41. As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of the Director Compensation. As such, the Debtors seek authority to continue to pay the Director Compensation postpetition in the ordinary course of business and consistent with their past practices.

**H. Employee Incentive and Retention Plans (Final Order Only).**

42. The Debtors maintain a number of incentive and retention plans to motivate, reward, and retain certain of their non-insider Employees as an additional component of overall compensation, including the Non-Insider Onshore Incentive Plan, Transition Retention Plan, the Rig of the Quarter Program, and Offshore Cash Incentive Plan (each as defined herein and, collectively, the "Incentive and Retention Plans"). The Debtors believe the Incentive Plans drive Employee performance, align Employees' interests with those of the Debtors generally, and promote the overall safety and efficiency of the Debtors' operations.

**1. Onshore Employee Incentive and Retention Plans**

43. *Non-Insider Onshore Incentive and Retention Plans*. The Debtors maintain incentive and retention programs to drive performance among non-insider Onshore Employees as

well as retain personnel that are integral to the Debtors' operations (the "Non-Insider Onshore Incentive and Retention Plans"). Under the Non-Insider Onshore Incentive and Retention Plans, the Debtors offer quarterly awards to up to 415 Employees based on certain performance targets, among them Company cash savings, EBITDA, safety performance, achieved expense reductions, rig downtime, and the recipient's continued employment with the Debtors through the previous calendar quarter. Under the Non-Insider Incentive and Retention Plans, the Debtors also offer retention payments to specific key personnel. These Employees work in human resources, legal, marketing, and technology and are crucial to the Debtors' operations. During the 2019 calendar year, the Debtors paid $616,000 in the aggregate to 30 non-insider Employees. As of the Petition Date, the Debtors do not believe they owe any amounts under the Non-Insider Onshore Incentive and Retention Plans. Postpetition, the Debtors estimate that recipients are eligible to receive up to $23.2 million in the aggregate. Accordingly, the Debtors request the authority, solely pursuant to the Final Order, to continue the plans postpetition in the ordinary course of business.

44. *Transition Retention Plan.* The Debtors have also established a retention plan for approximately 70 non-insider Onshore Employees who received in June 2020 their notice of termination but whose employment has not yet terminated (the "Transition Retention Plan"). Under the Transition Retention Plan, payments are conditioned upon the recipient's employment with the Debtors continuing through the recipient's expected separation date, which spans from December 2020 through February 2021. The Debtors estimate that aggregate payments under the Transition Retention Plan may total up to approximately $1.7 million. No obligations to Employees have yet come due on account of the Transition Retention Plan. The Debtors seek the

authority, solely pursuant to the Final Order, to continue the Transition Retention Plan postpetition and honor their obligations under the Transition Retention Plan as they come due.

**2. Offshore Employee Incentive Plans.**

45. *Rig of the Quarter Program*. The Debtors maintain an incentive plan for non-Insider Offshore Employees referred to as the "Rig of the Quarter" program (the "Rig of the Quarter Program"). Each calendar quarter, the Offshore Employees assigned to various active drilling rigs are rated based on specific performance criteria. At the end of the quarter, the Offshore Employees on the three rigs that rated the highest based on certain predetermined metrics receive incentive award payments. In the second quarter of 2020, the Debtors paid approximately $500,000 to Offshore Employees on account of the Rig of the Quarter Program. As of the Petition Date, the third quarter recipients under the Rig of the Quarter Program have not yet been determined. Thus, the Debtors do not currently have any outstanding obligations under the Rig of the Quarter Program. The Debtors seek authority to continue the Rig of the Quarter Program, solely pursuant to the Final Order, in the ordinary course of business postpetition.

46. *Offshore Cash Incentive Plan*. The Debtors additionally maintain an annual cash incentive for senior non-insider Offshore Employees based on the safety and performance of the rig and its crew over the prior calendar year (the "Offshore Cash Incentive Plan"). Pursuant to the Offshore Cash Incentive Plan, certain Offshore Employees are eligible to receive a target award equal to that Employee's one month base salary. The Debtors estimate that the program will cost the Debtors approximately $3.1 million for 2020, with payment due March 2021. The program is offered to approximately 160 Employees for the 2020 calendar year. The Debtors do not currently have any outstanding obligations under the Offshore Cash Incentive Plan. The Debtors seek

authority to continue the Offshore Cash Incentive Plan postpetition, solely pursuant to the Final Order, in the ordinary course of business.

47. To reiterate, as of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of the Incentive Plans. Out of an abundance of caution, however, to safeguard Employee morale and optimize performance during these chapter 11 cases, the Debtors seek authority to honor all fully earned obligations under the Incentive Plans in the ordinary course of business and postpetition.

**II. Employee Health Benefits and Entitlements.**

48. The Debtors offer health and welfare benefits to eligible Employees for medical, dental, and vision care coverage and certain other welfare benefits, including, Life and AD&D Insurance Benefits, Disability Benefits, the Workers' Compensation Program, the Retirement Savings Plans, and Entitlements (each as defined herein, and collectively, the "Employee Health Benefits and Entitlements").

**A. Health Insurance Benefits.**

49. The Debtors offer Employees the opportunity to participate in a variety of health benefit plans, including the Medical Plan, the Dental Plan, and the Vision Plan (each as defined herein, and collectively, the "Health Insurance Benefits"). The Health Insurance Benefits are customary for similarly-sized companies, and the participants and their dependents have come to rely on the Health Insurance Benefits. Without the Health Insurance Benefits, participants would be forced to either forgo health benefit coverage completely or obtain potentially expensive out-of-pocket insurance coverage, which would adversely affect Employee morale. The Debtors seek authority to pay or remit all prepetition amounts due on account of the Health Insurance Benefits and continue offering the Health Insurance Benefits and pay amounts owed thereunder postpetition in the ordinary course of business and consistent with past practices.

50. The Health Insurance Benefits are funded directly by the Debtors through premiums, or by Employees via payroll deductions. The Debtors estimate that they deduct or remit an aggregate amount of approximately $4.7 million each month on account of the Health Insurance Benefits. As of the Petition Date, the Debtors estimate that they owe approximately $6.0 million on account of the Health Insurance Benefits, $4.7 million of which will become due in the Interim Period. The Debtors seek authority to pay any prepetition amounts owed on account of the Health Insurance Benefits and to continue honoring their obligations postpetition in the ordinary course of business and consistent with past practices. The following is a detailed description of each of the Health Insurance Benefits provided by the Debtors.

**1. Medical Plans.**

51. The Debtors offer U.S. Employees three medical plan options: the Standard Plan, the Premium Plan, and the Valaris Health Savings Plan (collectively, the "U.S. Medical Plans"). The Standard and Premium Plans are traditional PPO medical and prescription drug benefit programs, and the Valaris Health Savings Plan is a high-deductible health plan with a Health Savings Account (the "Health Savings Plan"). All three plans are administered by Blue Cross Blue Shield of Texas ("BCBS"). All three plans have different monthly premiums, annual deductibles, and out-of-pocket maximums, and participants pay monthly premiums between approximately $75 and $430 depending on the level of coverage selected under their chosen plan option. U.S. citizen Expatriate Employees paid in U.S. dollars are offered two PPO medical and prescription drug benefit programs administered by Cigna Health and Life Insurance Company ("Cigna"): the Select Standard Plan and the Select Premium Plan (the "U.S. Expatriate Medical Plans"). Other Non-U.S.-based Employees paid in U.S. dollars are offered the Valaris Global Health Program (the "International Medical Plan" and together with the U.S. Medical Plans and

the U.S. Expatriate Medical Plans, collectively the "Medical Plans") issued and administered by a variety of insurers, including Vertikal, BUPA Arabia For Cooperative Insurance, PALIG, and SBW (together with BCBS and Cigna, the "Medical Plan Providers"). Unlike the U.S. Medical Plans, the International Medical Plans generally include dental and vision benefits along with medical and prescription drug benefits. Approximately 2,100 Employees participate in the Medical Plans. The Debtors' monthly cost to provide the Medical Plans on behalf of their Employees is approximately $4.1 million, $3.2 million of which is paid for by the Debtors.

52. The Debtors' U.S. Medical Plans are required to offer former U.S. Employees certain health benefits following their departure from the Debtors. More specifically, pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), former Employees of the Debtors (the "COBRA Employees") may continue insurance coverage under the Medical Plan, Dental Plan, and Vision Plan (the "COBRA Benefits"). COBRA Employees are entitled by law to continue to receive COBRA Benefits for up to eighteen months, and in some instances up to 36 months, following termination of employment.

53. COBRA Employees are responsible for paying all costs associated with the COBRA Benefits except with respect to those Employees who are eligible for three months of subsidized COBRA medical benefits on account of their participation in a voluntary transition plan. Similarly, Employees who elect to receive benefits under the Vision Plan pay all costs associated with those benefits. The Debtors provide for COBRA benefits as part of their usual expenditure on account of the Medical Plans and accordingly do not believe they owe any prepetition amounts on account of COBRA Benefits. The Debtors seek authority (a) to pay any prepetition amounts outstanding on account of the COBRA Benefits solely out of an abundance of caution, (b) to continue to offer the COBRA Benefits, including to those Employees who may

be terminated after the Petition Date, and honor all postpetition obligations related thereto in the ordinary course of business and consistent with past practices, and (c) to continue to pay fees related to the COBRA Benefits postpetition in the ordinary course of business and consistent with past practices.

**2. Dental Plans.**

54. The Debtors provide dental benefits to approximately 2,100 Employees who do not otherwise receive such benefits through their respective Medical Plans. The dental plans (the "Dental Plans") are issued and administered by a variety of insurance providers including BCBS, Cigna, and PALIG. Generally, the Dental Plans provide benefits for preventative services, basic care, and restorative services for covered Employees and their respective dependents. The aggregate monthly cost to provide the Dental Plans is approximately $180,000; of that, $90,000 is paid for by the Debtors.

**3. Vision Plan.**

55. The Debtors provide a separate vision plan (the "Vision Plan") to approximately 2,000 U.S. Employees issued and administered by Vision Service Plan and Cigna. The Vision Plan provides benefits for annual eye exams, eyeglasses, and contact lenses for covered Employees and their respective dependents. The Debtors do not incur any costs associated with the Vision Plan; the monthly cost to provide the Vision Plan is funded through participating Employees' withholdings of approximately $30,000 a month in the aggregate.

**4. Flexible Spending Accounts.**

56. The Debtors offer their U.S. Employees options for saving pre-tax dollars to help pay for health care and dependent care expenses, regardless of whether the Employee is enrolled the U.S. Medical Plan. Employees who enroll in the Flexible Spending Account (the "FSAs") are

provided with a tax-free savings account to help pay for certain medical deductible, prescription drug, dental, and vision expenses. The annual limit for contributions to the healthcare FSA is $2,750 and the annual limit for contributions to the dependent care FSA is $5,000. Contributions to the FSAs are withheld from gross Wages. Approximately 160 Employees are enrolled in FSAs. The Debtors pay approximately $6,500 per year in administration costs on account of the FSAs. As of the Petition Date, the Debtors do not believe they presently owe any prepetition amounts on account of the FSA administrative fees.

**5. Health Savings Accounts.**

57. The Debtors offer their U.S. Employees additional options for saving pre-tax dollars to help pay for health care expenses through Health Savings Accounts ("HSAs") at Bank of America. U.S. Employees are only eligible to participate if they have elected to participate in the high-deductible health plan (the "Health Savings Plan"). Each participant can contribute up to the IRS limits, and the Debtors match participants' contributions for $600, $900, or $1,200 dependent on the participant's eligibility under the Plan. Contributions to the HSAs are withheld from gross Wages. Approximately 160 Employees are enrolled in the Health Savings Plan. On an annual basis, the Debtors pay approximately $160,000 in matching contributions and administration costs on account of the HSAs. As of the Petition Date, the Debtors estimate they owe approximately $13,340 on account of the HSAs.

**B. Insurance, Disability, and Workers' Compensation Programs.**

**1. Life and AD&D Insurance.**

58. The Debtors provide basic life insurance ("Basic Life Insurance") and accidental death and dismemberment insurance ("AD&D Insurance," and, together with Basic Life Insurance, collectively the "Life and AD&D Insurance") to all Employees and their eligible dependents pursuant to group policies issued and administered by a variety of insurance providers

such as Cigna, Metlife, Protector, and PALIG. Eligible Employees also have the option to purchase additional levels of coverage. In the event of a death, many Employees' long-term planning consists solely of the Life and AD&D Insurance.

59. Life and AD&D Insurance is provided at no cost to Employees.[7] Although the specifics of each policy vary by insurance provider, in general, baseline coverage for Basic Life Insurance equals two to three times an Employee's annual base salary, subject to escalating reductions starting at age 65. Maximum coverage is capped at $1.5 million. In addition, AD&D Insurance provides coverage equivalent to two times an Employee's annual base salary should, subject to escalating reductions starting at age 67, bodily injury be sustained caused by an accident resulting in death or 100% total permanent disablement. Maximum coverage is capped at $1.5 million. The Debtors pay approximately $90,000 per month in premiums and administrative costs with respect to the Life and AD&D Insurance.

60. As of the Petition Date, the Debtors estimate that the aggregate amount of unpaid prepetition obligations with respect to the Life & AD&D Insurance Benefits is approximately $110,000, all of which will become due in the Interim Period. The Debtors believe that continuing the Life and AD&D Insurance Benefits is essential to maintaining morale, adhering to Employees' expectations, and protecting their families from the impact of a death or serious injury. The Debtors seek authority to pay any prepetition amounts owed on account of the Life and AD&D Insurance Benefits and to continue honoring their obligations postpetition in the ordinary course of business and consistent with past practices.

[7] Employees in the U.S. and Canada may elect to enroll in additional Life and AD&D Insurance at an additional cost to the relevant Employee.

**2. Disability Benefits.**

61. The Debtors provide Employees with both short-term disability benefits (the "Short-Term Disability Benefits") and long-term disability benefits (the "Long-Term Disability Benefits," and together with the Short-Term Disability Benefits, collectively, the "Disability Benefits") pursuant to group policies issued and administered by Cigna. The Debtors self-insure the Short-Term Disability Benefits and pay claims through the U.S. payroll system. The Long-Term Disability Benefits are fully insured through Cigna. The Debtors provide Disability Benefits to Employees on non-U.S. payrolls through similar programs. Disability Benefits are particularly critical in the offshore drilling industry, where Employees face dangerous conditions and the threat of injury is real.

62. Although the specifics of each policy vary by insurance provider, in general, under the Short-Term Disability Benefits program, eligible Employees are entitled to receive between 70 and 100 percent of their weekly base salary for 90 days for the Employees paid in U.S. dollars. Following the period of Short-Term Disability Benefits, Employees are eligible to receive Long-Term Disability Benefits. In general, under the Long-Term Disability Benefits Program, eligible Employees are entitled to receive 50 percent of their monthly base salary for a period of up to ten years. Disability Benefits are generally subject to a limit which varies by policy. For example, for U.S. Employees who receive Disability Benefits from Cigna, Long-Term Disability Benefits are limited to $10,000 per month.

63. Disability Benefits are provided at no cost to Employees. Each month, the Debtors pay approximately $0.3 million to provide the Disability Benefits to Employees. As of the Petition Date, the Debtors estimate they owe approximately $1.1 million on account of the Disability Benefits, $0.3 million of which will become due in the Interim Period. Employees have come to

rely on the Disability Benefits as their sole form of wage-loss relief should they be unable to work in the future. As such, the Debtors seek authority to honor any accrued but unpaid prepetition amounts on account of the Disability Benefits and to continue to provide the Disability Benefits postpetition in the ordinary course of business and consistent with past practices.

### 3. Workers' Compensation Programs and Jones Act Coverage.[8]

64. In the ordinary course of business, the Debtors maintain multiple workers' compensation policies in accordance with applicable requirements in the United States and other countries in which the Debtors operate (collectively, "Workers' Compensation Programs"). Employees in the United States, Nigeria, Malaysia and Singapore, and other jurisdictions are covered for injury claims by the Workers' Compensation Programs. The Debtors maintain coverage for the Workers' Compensation Program through a variety of insurance providers, including American International Group, Lloyd's of London, Signal Mutual Indemnity Association, Ltd., and First Liberty Insurance Corp. (the "Insurance Providers"). The Debtors pay approximately $9.2 million to the Insurance Providers annually for maintaining the Workers' Compensation Programs (the "Insurance Obligations").

65. In the 2018-2019 policy year, the Debtors paid approximately $2.7 million in claims related to the Workers' Compensation Programs (the "Workers' Compensation Obligations"). The Debtors must continue the claim assessment, determination, adjudication, and payment process in connection with the Workers' Compensation Obligations without regard to whether such liabilities were outstanding before the Petition Date to

[8] Concurrently herewith, the Debtors have filed the *Debtors'* Emergency *Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue their Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto, and (B) Renew, Amend, Supplement, Extend and Enter into New Insurance Policies, (C) Continue Their Surety Bond Program, and (II) Granting Related Relief* (the "Insurance Motion"). The Debtors are not seeking relief related to workers' compensation programs in the Insurance Motion.

ensure that the Debtors comply with applicable laws and requirements.[9] Accordingly, the Debtors seek authority to continue to maintain the Workers' Compensation Programs, including the Insurance Obligations and the Workers' Compensation Obligations, in the ordinary course of business, including by modifying the automatic stay solely to facilitate the administration of the Workers' Compensation Program.

66. In addition to the Workers' Compensation Programs, in the United States the Debtors' maintain coverage for claims by Employees under the Jones Act.[10] Jones Act coverage is provided under the Debtors' protection and indemnity insurance policies, which the Debtors seek to continue through the Insurance Motion. The Debtors' protection and indemnity insurance policies also provide similar protections relating to personal injury claims of Employees engaged on offshore rigs working in non-U.S. jurisdictions. The Debtors are obligated under the Jones Act and applicable general maritime law to provide injured seamen with no-fault maintenance and cure benefits (the "Maintenance and Cure Claims"). On average, the Debtors remit $175,000 per month in Maintenance and Cure Claims on account of job-related injuries. The Debtors estimate that they owe approximately $11.4 million in accrued but unpaid Maintenance and Cure Claims as of the Petition Date, $0.4 million of which will become due in the Interim Period. The Maintenance and Cure Claims cover offshore Employees, who are not covered under the Workers'

[9] The Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. By this Motion, the Debtors request authority to continue making all payments related to Workers' Compensation Obligations postpetition, including making any changes to current policy and practices that become necessary.

[10] The Jones Act provides a cause of action for "any seaman" injured "in the course of his employment." 46 U.S.C. § 30104. Many individuals who do not qualify as seamen under the Jones Act, such as workers on fixed platforms, are eligible for compensation under the Longshore and Harbor Workers' Compensation Act (the "LHWCA"), which provides for compensation for employees whose "disability or death results from an injury occurring upon the navigable waters of the United States." 33 U.S.C. § 903(a). The two acts are mutually exclusive and apply to different categories of maritime employees. Employees and Independent Contractors serving on the Debtors' drillships, semisubmersibles, and jack-up rigs in U.S. waters are covered by the Jones Act, while those engaged in platform and/or shipyard operations are covered under the LHWCA.

Compensation Programs. By this Motion, the Debtors seek the authority, but not the direction, to pay any accrued Maintenance and Cure Claims postpetition in the ordinary course of business and consistent with past practices. In addition, the Debtors seek relief to modify the automatic stay to facilitate the administration and adjudication of the Maintenance and Cure Claims in the ordinary course of business and consistent with past practice.

**C. Employee Savings and Retirement Plans.**

67. The Debtors offer certain Employees the opportunity to participate in the 401(k) Plan, the various International Defined Contribution Plans, the Pension Plans, the Government Sponsored Retirement Plans, Supplemental Retirement Plans, and the Retiree Health Coverage (each as defined herein, and collectively, the "Retirement Savings Plans"). In certain instances, the Debtors assumed legacy benefit arrangements and related obligations in connection with their corporate acquisitions in the last several decades.

**1. The 401(k) Plan.**

68. The Debtors provide eligible U.S. Employees with the ability to participate in a 401(k) plan (the "401(k) Plan") administered by T. Rowe Price ("T. Rowe") for which the Debtors pay T. Rowe approximately $19 per participant per quarter in administrative fees (the "T. Rowe Fees") deducted from the 401(k) Plan assets. Additionally, the Debtors employ Mercer Investments LLC ("Mercer") as financial advisors and Whitley Penn as the plan auditor, for which the Debtors pay approximately $22,500 in financial advisor fees per quarter (together with the T. Rowe Fees, the "401(k) Fees"). Approximately 1,680 Employees currently participate in the 401(k) Plan.

69. Participating Employees may contribute up to 50% of their annual compensation subject to the annual Internal Revenue Service ("IRS") limits for contributions and eligible compensation. The Debtors deduct the participating Employees' 401(k) Plan contributions from

the Employees' Wages in connection with their applicable pay periods and hold such amounts in trust until they are forwarded to T. Rowe. Approximately $1.7 million is deducted from Employees' pay in the aggregate each monthly period on account of Employees' 401(k) contributions to the 401(k) Plans (the "401(k) Deductions"). As of the Petition Date, the Debtors estimate they hold approximately $0.5 million in trust on account of the prepetition 401(k) Deductions that have not been remitted to T. Rowe, all of which will be remitted in the Interim Period.

70. The Debtors previously provided certain matching contribution programs for certain of its U.S. Employees (the "401(k) Matching Contributions") but ended such programs on August 1, 2020. As of the Petition Date, the Debtors do not owe any amounts on account of the 401(k) Matching Contributions. As of the Petition Date, the Debtors estimate that they owe approximately $22,500 T. Rowe Fees that have not been remitted to T. Rowe, all of which will become due in the Interim Period.

71. Many Employees' retirement savings consist solely of their 401(k) Plan. Thus, the Debtors believe that continuing the 401(k) Plan is essential to maintaining Employee morale. The Debtors seek the authority to (a) pay any accrued but unpaid amounts owed on account of the 401(k) Plan, including prepetition 401(k) Fees and 401(k) Matching Contributions, and remit any unpaid prepetition 401(k) Deductions and (b) continue the 401(k) Plan postpetition in the ordinary course of business and consistent with past practices.

**2. International Defined Contribution Plans.**

72. The Debtors additionally maintain and sponsor two separate defined contribution plans for Employees not based in the United States, whereby eligible Employees may elect to contribute a percentage of their salary to a retirement savings account

(each, a "Defined Contribution Plan"): a plan for eligible Employees in Norway, and a multinational savings program available to eligible Employees in other non-U.S. jurisdictions. Collectively, approximately 940 Employees participate in the Defined Contribution Plans. As of the Petition Date, the Debtors estimate they hold approximately $0.5 million in trust on account of the Defined Contribution Plans.

73. To assist with administration of the Defined Contribution Plans, the Debtors utilize the services of plan administrators, including Storebrand, Butterfield, GGSI, and UBS Financial Services (the "Defined Contribution Plan Administrators"). The Debtors pay approximately $22,500 in administrative fees per quarter in the aggregate (the "Defined Contribution Plan Administrator Fees") to the Defined Contribution Plan Administrators.

74. Approximately $0.4 million is withheld from Employees' pay in the aggregate each monthly period on account of Employees' contributions to the Defined Contribution Plans (the "Defined Contribution Withholdings"). As of the Petition Date, the Debtors estimate they hold approximately $0.4 million in trust on account of the prepetition Defined Contribution Withholdings that have not been remitted to the Defined Contribution Plan Administrators, all of which will become due in the Interim Period.

75. The Debtors additionally provide a contribution to the plan maintained for Employees in Norway who have elected to participate (the "Defined Contributions"). The Debtors pay on average approximately $0.1 million in Defined Contributions per monthly pay period and remit the Defined Contributions to the Defined Contribution Plan Administrators on a monthly basis.

76. As of the Petition Date, the Debtors estimate that they owe approximately $0.2 million in prepetition Defined Contributions and Defined Contribution Plan Administrator

Fees that have not been remitted to the Defined Contribution Plan Administrators, all of which will become due in the Interim Period. Many Employees' retirement savings consist solely of their Defined Contribution Plan and many Employees choose to participate based on the Defined Contributions. The Debtors believe that continuing the Defined Contribution Plans and the Defined Contributions is essential to maintaining Employee morale. The Debtors seek the authority to (a) pay any accrued but unpaid amounts owed on account of the Defined Contribution Plans, including prepetition Defined Contribution Plan Administrator Fees and Defined Contributions, and remit any unpaid prepetition Defined Contribution Withholdings to the Defined Contribution Plan Administrators and (b) continue the Defined Contribution Plans and Defined Contributions postpetition in the ordinary course of business and consistent with past practices.

**3. Pension Plans.**

77. Certain of the Debtors sponsor and maintain defined benefit pension plans for eligible current or former Employees (the "Pension Plans").[11]

**a. Norway Defined Benefit Plans.**

78. In connection with the Rowan Merger, the Debtors assumed two defined benefit plans for eligible Employees in Norway: the "Norway Onshore Plan" for Onshore Employees and the "Norway Offshore Plan" for Offshore Employees (together the "Norway Defined Benefit Plans"), both of which are required under the applicable CBAs. The Norway Defined Benefit Plans are each administered by Avtalefestet Pensjon (AFP) and Storebrand. As of June 1, 2020, approximately 450 Employees in the aggregate participate in the Norway Defined Benefit Plans. As of the Petition Date, the Debtors estimate that they have $1.4 million in outstanding obligations

[11] The Debtors also seek the authority to continue postpetition in the ordinary course the "French Top Hat Plan," a defined benefit plan maintained for the benefit of retirees who are former Employees of Debtor Pride Forasol S.A.S. Two former Employees participate in this plan.

on account of the Norway Defined Benefit Plans, all of which will come due in the Interim Period. The Debtors seek authority to continue the Norway Defined Benefit Plans postpetition in the ordinary course of business.

**b. Legacy Rowan Pension Plan (Final Order Only).**

79. Debtor Rowan Companies, Inc. maintains and sponsors a qualified defined benefit pension plan ( the "Legacy Rowan Pension Plan") under the Internal Revenue Code and ERISA for certain former Employees. The Legacy Rowan Pension Plan was also assumed in connection with the Rowan Merger and has been frozen to all new participants and benefit accruals since June 30, 2018. As of January 1, 2019, the Legacy Rowan Pension Plan covered approximately 4,480 participants, 1,048 of whom are current Employees, and the remainder retirees receiving immediate or deferred benefits. The Legacy Rowan Pension Plan is administered by Mercer and with JPMorgan Chase, N.A. as trustee. The Debtors pay approximately $50,000 per quarter in fees to Mercer and JPMorgan.

80. As of April 1, 2020, the Legacy Rowan Pension Plan is considered underfunded. The projected unfunded obligation Legacy Rowan Pension Plan is approximately $560 million (on a termination basis). The Pension Recipients receive approximately $2.8 million in the aggregate on a monthly basis under the Legacy Rowan Pension Plan from the pension trust fund. Payments to recipients are not drawn from the Debtors' cash on hand but are paid by the trust. For the plan year beginning January 1, 2019, the minimum funding contribution for the Legacy Rowan Pension Plan (with adjusted interest rates) is $24.6 million, of which the Company has already paid $14.6 million. The remaining payment comes due on September 15, 2020; however, pursuant to

the CARES Act,[12] the Debtors may, in their sole discretion, defer payment until January 1, 2021. Additionally, the Debtors estimate that as of January 1, 2021 they will owe approximately $6.6 million on account of the plan year beginning January 1, 2020, and $1.9 million of accrued and unpaid interest. As a result, the Debtors do not have current outstanding cash obligations on account of the Legacy Rowan Pension Plan.

81. The Debtors, however, do pay approximately $2.8 million in annual premiums to the Pension Benefit Guaranty Corporation (the "PBGC"). These premium payments are not drawn from the Debtors' cash on hand, as premiums are drawn from the pension trust fund. As of the Petition Date, the Debtors do not believe they have any premiums due and owing. By this Motion, the Debtors request authorization to continue the Legacy Rowan Pension Plan postpetition, solely pursuant to the Final Order, including making distributions and premium payments as they come due, and to honor any other prepetition obligations related therewith in the ordinary course of business.

**4. Government Sponsored Retirement Plans.**

82. In certain non-U.S. jurisdictions, the Debtors are required by applicable law to contribute to government mandated retirement programs (the "Government Sponsored Retirement Plans"). Accordingly, approximately 600 Employees currently participate in the Government Sponsored Retirement Plans in Norway, Australia, Saudi Arabia, Singapore, Brazil, and Trinidad.

83. As of the Petition Date, the Debtors estimate that they owe approximately $1.3 million in prepetition payments on account of the Government Sponsored Retirement Plans,

---

12 The Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") was signed into law by the President of the United States on March 27, 2020, and temporarily relaxes minimum funding requirements by extending the due date for minimum funding contributions (including quarterly contributions) originally due in 2020, until January 1, 2021. Any such amounts paid after their original due date must be adjusted for interest accrued between the original due date and the payment date, at the plan's effective rate of interest.

all of which will become due in the Interim Period. In many instances, Employees' retirement savings consist solely of their Government Sponsored Retirement Plan and continuing to contribute to these plans is mandated by law. The Debtors seek authority to (a) pay any accrued but unpaid amounts owed on account of the Government Sponsored Retirement Plans and (b) continue payments on account of the Government Sponsored Retirement Plans postpetition in the ordinary course of business and consistent with past practices.

**5. Supplemental Non-Qualified Retirement Programs.**

84. The Debtors offer a number of supplemental nonqualified plans that are not subject to ERISA standards or protections and provide a tax deferred income to participants (collectively, the "Supplemental Retirement Plans"). As of the Petition Date, the Debtors estimate that they owe approximately $39.0 million in the aggregate on account of the Supplemental Retirement Plans. The amount that the Debtors pay to recipients each month varies depending on, among other things, the date of retirement of each recipient. The Debtors seek authority, solely pursuant to the Final Order, to pay prepetition and postpetition amounts outstanding as they come due in the ordinary course of business, and to continue these programs postpetition in the ordinary course of business.

85. The Supplemental Retirement Plans include:

**a. Legacy Rowan DB SERP (Final Order Only).**

86. The Debtors maintain an unfunded defined benefit supplemental executive retirement plan for legacy Rowan Employees (the "DB SERP"). Approximately 12 former Employees and 10 current Employees and their families depend on the DB SERP for which the Debtors pay approximately $1.5 million on an annual basis. Payments under the DB SERP are administered by Mercer and are made in a number of annual installments, as elected by participants in the DB SERP. The next monthly payment due under the DB SERP, approximately $100,000,

will become due on September 1, 2020. As of the Petition Date, approximately $56,000 is due and outstanding under the DB SERP.

**b. Legacy Ensco DC SERP (Final Order Only).**

87. The Debtors also maintain three defined contribution supplemental executive retirement plans for legacy Ensco Employees and their families (the "DC SERP") that have been frozen since January 1, 2020. Approximately 122 current and former Employees depend on the DC SERP, which is fully funded by a "rabbi trust" with T. Rowe acting as trustee, with approximately $21.9 million of assets. Payments under the DC SERP are made either in a single lump sum or in a number of annual installments, as elected by participants in the DC SERP. The Debtors pay T. Rowe approximately $1,750 per year in connection with its role as trustee of the DC SERP. In the first quarter of 2020, approximately $1.5 million of benefits were distributed from the Trust.

88. The Debtors seek the authority, but not direction, solely pursuant to the Final Order, to (a) continue the Supplemental Retirement Plans in the ordinary course of business postpetition, (b) remit all Supplemental Retirement Plan amounts in the ordinary course of business, and (c) access the funds in the rabbi trust, and/or direct T. Rowe with respect thereto, for purposes of honoring their obligations under the DC SERP in the ordinary course of business. For the avoidance of doubt, no payments under the Supplemental Retirement Plans will be made to Insiders.

**6. Retiree Health Coverage.**

89. The Debtors provide approximately 580 former Employees, their spouses, and children access to their Health Insurance Benefits pursuant to two separate legacy plans for Rowan and Ensco retirees (together, the "Retiree Health Coverage Plans"). A portion of the cost is borne by the retirees through monthly contributions. In the 12 months before the Petition Date, the

Debtors' monthly payments on account of claims under the Retiree Health Coverage Plans averaged approximately $80,000, and retirees' monthly contributions averaged approximately $7,400. The aggregate accrued liability to pay out future claims under the Retiree Health Coverage Plans, based on an actuarial analysis, is currently approximately $21.7 million, of which approximately $110,000 will become due in the Interim Period. Under the legacy Rowan plan, the Debtors reimburse the participants for approved medical expenses through a Health Reimbursement Account ("HRA").

90. The Debtors seek authority to continue to pay amounts incurred on account of the HRA and Retiree Health Coverage Plans and to continue these programs postpetition in the ordinary course of business.

**D. Time-Off Benefits.**

91. The Debtors offer several paid and unpaid time-off benefits for non-insider Employees, including Paid Time Off ("PTO"), Sick Leave, Holidays, Parental Leave, and Other Paid Leave (each as defined below, and collectively, the "Time-Off Benefits").

92. In the ordinary course of business, the Debtors provide Employees in several jurisdictions with PTO as a paid time-off benefit. The specifics of the PTO programs vary from country to country but generally provide flexible PTO from work that Employees can use for such needs as vacation, personal or family illness, doctor appointments, and other activities. Generally, Employees who are terminated or resign with unused PTO are entitled to cash payments based on unused PTO.

93. Offshore Employees are not entitled to PTO due to their offshore working shifts, which are set periods of days working offshore, followed by an equal amount of days onshore with travel time taken during the leave period. The exact number of days in the offshore/onshore

rotation varies by geographical location. Accordingly, PTO is incorporated into the normal offshore/onshore schedule and there is no entitlement to additional time off.

94. In the ordinary course of business, certain Employees are eligible for paid sick leave ("Sick Leave"). The amount of Sick Leave provided to Employees depends upon such Employee's country of employment. For example, Saudi Arabian labor laws provide that all eligible Employees receive full wages for the first 30 days of Sick Leave, followed by 75% of full wages for the next 60 days. U.S. exempt Offshore Employees receive 10 days of Sick Leave. Extended leave requirements are covered by the Short-Term Disability Benefits as described above. Employees may not cash out their unused Sick Leave upon termination/resignation.

95. The Debtors offer Onshore Employees between eight and thirteen fixed/floating paid holidays throughout the year (collectively, the "Holidays"). The number of Holidays provided to an Employee depends upon local custom in such Employee's country of employment. Generally, eligible Employees are not required to work on a designated Holiday but are paid at their regular base rate of pay. Offshore Employees are not entitled to Holidays due to the normal offshore/onshore rotation as described above.

96. The Debtors provide eligible Employees with varying amounts of paid parental leave following the birth or adoption of a child (the "Parental Leave") based upon the nation of employment. The majority of eligible Employees are provided 20 working days of paid Parental Leave. For eligible female U.S. Employees, the Parental Leave may be used in conjunction with and after Short Term Disability benefits are exhausted. In addition, U.S. Employees are provided with up to twelve weeks of unpaid leave in accordance with the Family and Medical Leave Act. Offshore Employees are not provided with paternity leave due to the normal offshore/onshore schedule as described above.

97. The Debtors also provide eligible Employees who need extended time to attend to certain family or personal needs, such as attending a funeral or caring for a family member with a serious illness, with up to five days of paid leave for Onshore Employees and seven days for Offshore Employees (the "Other Paid Leave"). In general, there is no entitlement to any additional unpaid leave, although the Debtors may make certain exceptions on an emergency basis.

98. The Debtors believe that the continuation of the Time-Off Benefits in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. The Debtors do not believe they presently owe any prepetition amounts on account of the Time-Off Benefits. As such, the Debtors seek authority to (a) pay any prepetition amounts on account of the Time-Off Benefits solely out of an abundance of caution and (b) continue to pay the Time-Off Benefits postpetition in the ordinary course of business and consistent with past practices.

**E. Location Entitlements.**

99. Depending on an Employee's country of employment, the Debtors provide certain Employees with various entitlements based on, among other things, the expense of living in a particular location or the difficulty in making living arrangements without assistance from the Debtors (the "Location Entitlements"). The Debtors are responsible for relocating Employees to their country of employment as well as repatriating them to their home countries at the end of their assignments. For example, the Debtors pay for the tuition of children of non-local or expatriate Onshore Employees located in certain metropolitan areas. The Debtors also pay annual enrollment fees and tuition for moderately priced accredited schools for the children of Expatriate Employees in certain jurisdictions. The Debtors also provide Expatriate Employees in certain jurisdictions with company housing and arrange for transportation and utility service. The Debtors utilize Graebel and other logistics providers (the "Employee Logistics Providers") to assist with the living arrangements for their Employees. On average, the Debtors pay approximately $210,000 per

month for the Location Entitlements and for fees to Employee Logistics Providers (collectively, the "Location Entitlement Fees and Expenses").

100. As of the Petition Date, the Debtors believe they owe approximately $250,000 on account of the aggregate accrued and unpaid Location Entitlement Fees and Expenses, $200,000 of which will become due in the Interim Period. The Debtors believe that continuation of the Location Entitlement Fees and Expenses is essential to maintaining employee morale. The Debtors seek authority to pay all outstanding prepetition amounts incurred on account of the Location Entitlement Fees and Expenses and to continue to honor the Location Entitlement Fees and Expenses and all costs related thereto postpetition in the ordinary course of business and consistent with past practices.

## III. Other Obligations.

### A. Reimbursable Expenses.

101. The Debtors reimburse Employees for business expenses and other qualifying expenses incurred in carrying out their employment responsibilities, including, but not limited to, expenses for meals, hotels, flights, per diems, car rentals, parking, fuel costs, and other qualifying expenses (collectively, the "Reimbursable Expenses"). Due to the international nature of the Debtors' business, certain non-executive Employees travel frequently between multiple sites within a specific geographic region. The Debtors must arrange transport for the Offshore Employees to and from the offshore work sites. The Debtors primarily employ the services of the ATPI Group ("ATPI") to manage booking for travel and accommodations (the "Travel Services") or other third party travel providers such as rental car companies or hotels. For Reimbursable Expenses beyond those arranged by ATPI, Employees submit electronic receipts to request reimbursement, and if approved in accordance with internal policies and procedures by the appropriate manager, the Reimbursable Expenses are processed through Concur. On average, the

Debtors pay approximately $200,000 million per month in Reimbursable Expenses, and approximately $3.1 million per month to ATPI for Travel Services.

102. As of the Petition Date, the Debtors estimate that they owe approximately $3.5 million in outstanding prepetition Reimbursable Expenses and Travel Services, $1.7 million of which will become due in the Interim Period.

103. Although the Debtors ask that reimbursement requests be submitted promptly, sometimes submission delays occur. Employees may submit reimbursement requests for prepetition expenses after the Petition Date. Reimbursable Expenses are incurred with the understanding that they will be reimbursed. Without continued reimbursement of the Reimbursable Expenses, Employees relying on these benefits would be responsible for additional costs, causing personal financial hardship. The Travel Services provided by ATPI are also crucial to the smooth functioning of the Debtors' continued reimbursement of Reimbursable Expenses. To avoid harming Employees who incurred Reimbursable Expenses, the Debtors seek authority to satisfy any accrued but unpaid prepetition Reimbursable Expenses and Travel Services and to continue to pay the Reimbursable Expenses and Travel Services postpetition in the ordinary course of business and consistent with past practices.

**B. Corporate Card Expenses.**

104. Employees pay for the majority of the Reimbursable Expenses they incur through a combination of commercial card accounts and related contractual arrangements with Bank of America.

105. The Debtors provide Bank of America corporate cards (the "Corporate Credit Cards") to fewer than 100 corporate Employees pursuant to a corporate card account agreement with Bank of America for ordinary course expenses they incur in performing their job functions. Corporate Credit Cards are used by Employees to charge business-

related travel expenses. It is essential to the continued operation of the Debtors' business that the Debtors be permitted to continue reimbursing, or making direct payments on behalf of, Employees for such expenses. On average, the Debtors pay approximately $3.4 million per month to Bank of America for amounts incurred on the Corporate Cards that are submitted for reimbursement to the Debtors.

106. As of the Petition Date, the Debtors believe they owe approximately $2.9 million on account of the Corporate Cards, all of which will become due in the Interim Period. The Debtors request authorization to pay all outstanding prepetition amounts incurred on account of the Corporate Cards (the "Corporate Card Expenses") and to continue paying all outstanding amounts incurred on account of the Corporate Cards postpetition in the ordinary course of business and consistent with their prepetition practices.

**C. Non-Insider Severance Programs.**

107. The Debtors maintain a variety of severance programs for their non-insider onshore Employees as defined herein, including Notice Period Severance, Mandatory Severance, and the Non-Executive Severance Plan (each as defined herein, and collectively, the "Non-Insider Severance Programs"). Employees are owed anywhere from 14 to 168 days of base salary as severance depending on their location, seniority, and job description. Severance per person ranges from approximately $10,000 to $70,000.

**1. Notice Period Severance (Final Order Only).**

108. In general, non-insider Employees covered by an employment contract are entitled to a defined notice period (the "Notice Period Severance") in connection with a voluntary or involuntary separation of employment under their respective employment contracts. For example, Expatriate Employees employed by Ensco Asia Pacific Pte. Limited have Notice Periods ranging from 30 to 90 days depending on the length of employment. During these Notice Periods, the

Debtors, in their discretion, can elect to have the outgoing Employee provide transition services or suspend the Notice Period by paying a lump sum amount.

109. The Debtors believe that the Notice Period Severance is critical to maintaining Employee morale and loyalty. Payments on account of the Notice Period Severance are contractual obligations in the case of some Employees. The Debtors do not believe they presently owe any prepetition amounts on account of Notice Period Severance. As such, the Debtors seek authority to pay any prepetition amounts solely out of an abundance of caution, pursuant to the Final Order, and to continue to honor obligations in respect of the Notice Period Severance in the ordinary course of business and consistent with historical practices.

**2. Mandatory Severance (Final Order Only).**

110. In certain jurisdictions, the Debtors are required by law to provide severance benefits to terminated non-insider Employees (the "Government Mandated Severance"). For example, in Brazil, the Debtors are required to pay one-month's salary plus a 40% penalty for all terminated Employees. Government Mandated Severance is required in other jurisdictions, including Saudi Arabia, Singapore, and the U.A.E. In addition, certain of the Debtors' CBAs (as defined above) require severance payments to be made to terminated employees (the "Union Severance," and, together with the Government Mandated Severance, collectively, the "Mandatory Severance"). For example, in Angola, the applicable CBA requires Union Severance of one-month's salary to be paid to terminated Employees.

111. Payments on account of the Mandatory Severance are either required by law or a collective bargaining agreement. The Debtors estimate that they owe approximately $20,000 in prepetition amounts on account of Mandatory Severance. As such, the Debtors seek authority to pay such prepetition amounts, pursuant to the Final Order, and to continue to honor obligations in

respect of Mandatory Severance in the ordinary course of business and consistent with historical practices.

**3. Non-Executive Severance (Final Order Only).**

112. In the ordinary course of business, the Debtors provide severance benefits to non-insider Employees in the event of a termination by the Debtors that is not for "cause," by reason of death or disability, or if the Employee voluntarily resigns (the "Non-Executive Severance Plan"). Under the Non-Executive Severance Plan, eligible Employees receive, upon termination, a lump-sum payment determined by the Employee's role and length of service.

113. The Debtors believe that the Non-Executive Severance Plan has been critical to maintaining Employee morale and loyalty. Increased instability in the Debtors' workforce will undermine the Debtors' ability to strengthen their financial and operational foundation and to be positioned for long-term success. The Debtors do not believe they presently owe any prepetition amounts on account of the Non-Executive Severance Plan. As such, the Debtors seek authority to pay any prepetition amounts solely out of an abundance of caution, pursuant to the Final Order, and to continue to honor obligations in respect of the Non-Executive Severance in the ordinary course of business and consistent with historical practices.

114. For the avoidance of doubt, the Debtors do not seek to pay any amounts to insiders pursuant to this Motion on account of the Severance Programs. The Debtors will work in good faith with the U.S. Trustee to address any concerns with respect to the Severance Programs.

**IV. Unions.**

115. The Debtors employ approximately 590 Represented Employees who are members of a labor force union. The Represented Employees are parties to eight CBAs with the seven labor unions (collectively, the "Unions").

116. On average, the Debtors remit approximately $20,000 per month on account of union member dues (collectively, the "Union Dues"). As of the Petition Date, the Debtors estimate that they do not owe any amounts on account of the Union Dues. The Debtors seek authority to remit the Union Dues to the Unions and to continue to honor and process the Union Dues postpetition in the ordinary course of business and consistent with past practices.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors to Honor Employee Compensation and Benefit Obligations.

#### A. Certain of the Employee Compensation and Benefits Are Entitled to Priority Treatment.

117. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Employee Compensation and Benefits to priority treatment. As these are priority claims, the Debtors are required to pay these claims in full in order to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims, given priority under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, for (a) wages, salaries or commissions, including vacation, severance, and sick leave pay earned by an individual and (b) contributions to an employee benefit plan). To the extent that an Employee receives no more than the statutory prescribed limit on account of claims entitled to priority, the relief sought with respect to compensation only affects the timing of payments to Employees and does not have any material negative impact on recoveries for general unsecured creditors. Payment of Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties. Finding, attracting, and training new qualified talent would be extremely difficult and would most likely require higher salaries, guaranteed bonuses, and more comprehensive compensation packages than are currently provided to Employees.

**B. Payment of the Employee Compensation and Benefits Is Required by Law.**

118. The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party payees. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' Wages. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' Wages on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d). Federal and state laws require the Debtors to withhold certain tax payments from Employees' Wages and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors do not believe they need authority to remit these payments. Out of an abundance of caution, the Debtors request authority to transmit the Withholding Obligations to the proper parties in the ordinary course of business and consistent with prepetition practices.

119. State laws and laws of other jurisdictions require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws and laws of other jurisdictions may prohibit the Debtors from operating in those states or jurisdictions. Payment of all obligations related to the Workers' Compensation Program is therefore crucial to the Debtors' continued operations and the success of these chapter 11 cases.

**II. Payment of the Employee Compensation and Benefits Is Warranted under Section 363(b)(1) of the Bankruptcy Code and the Doctrine of Necessity.**

120. Courts generally acknowledge that it is appropriate to authorize the payment (or other special treatment) of prepetition obligations in appropriate circumstances. *See, e.g., Inst'l Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Ionosphere Clubs, Inc.*, 98 B.R. 175 (Bankr. S.D.N.Y. 1989) (granting authority to pay prepetition wages); *see also Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983) (granting authority to pay prepetition claims of suppliers who were potential lien claimants). In authorizing payments of certain prepetition obligations, courts have relied on several legal theories, rooted in sections 1107(a), 1108, 363(b), 507, and 105(a) of the Bankruptcy Code.

121. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *Id.* Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.*

122. Consistent with a debtor's fiduciary duties, courts have also authorized payment of prepetition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. *See, e.g., Ionosphere Clubs*, 98 B.R. at 175 (discussing prior order

authorizing payment of prepetition wage claims pursuant to section 363(b) and noting that relief is appropriate where payment is needed to "preserve and protect its business and ultimately reorganize, retain its currently working employees and maintain positive employee morale."); *see also Armstrong*, 29 B.R. at 397 (relying on section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors). The business judgment standard requires that a debtor "articulate some business justification, other than mere appeasement of major creditors." *Ionosphere Clubs*, 98 B.R. at 175.

123. This Court may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Under section 105(a), courts may permit preplan payments of prepetition obligations when essential to the continued operation of the debtor's business. Specifically, the Court may use its power under section 105(a) to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *In re NVR L.P.*, 147 B.R. 126, 127-28 (Bankr. E.D. Va. 1992).

124. The "doctrine of necessity" or the "necessity of payment" rule originated in railway cases and was first articulated in *Miltenberger v. Logansport, C. & S.W.R. Co.*, 106 U.S. 286 (1882). The doctrine was expanded to non-railroad debtors in the mid-century, *see Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (holding, in a hotel reorganization case, that the court was not "helpless" to apply the rule to supply creditors of non-railroad debtors where the alternative was the cessation of operations). Today, the rationale for the necessity of payment

rule—the rehabilitation of a debtor in reorganization cases—is "the paramount policy and goal of Chapter 11." *See Ionosphere Clubs*, 98 B.R. at 175-76.; *see also In re Just For Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code", but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"); *Burchinal v. Cent. Wash. Bank* (*In re Adams Apple, Inc.*), 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of pre-petition debts when necessary for rehabilitation" is appropriate); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition worker's compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); 2 Collier On Bankruptcy, 105.02[4][a] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2015) (discussing cases in which courts have relied on the "doctrine of necessity" or the "necessity of payment" rule to pay prepetition claims immediately).

125. This flexible approach is particularly critical where prepetition creditors, here Employees and related third parties, provide vital goods or services to a debtor that would be

unavailable if the debtor did not satisfy its prepetition obligations. For example, in *In re Structurlite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988), the bankruptcy court stated that "a bankruptcy court may exercise its equity powers under §105(a) [of the Bankruptcy Code] to authorize payment of pre-petition claims where such payment is necessary 'to permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately.'" *Id.* (citation omitted). The court explained that "a *per se* rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." *Id.* at 932.

126. Payment of Employee Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases. The majority of the Employees and Independent Contractors exclusively rely on the Employee Compensation and Benefits to satisfy their daily living expenses. Consequently, Employees and Independent Contractors will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits. Additionally, continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

127. Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the Employee Compensation and Benefits owed to the Employees and Independent Contractors, the Debtors may experience workforce turnover and instability at this critical time in these chapter 11 cases. The oil and gas industry is a highly specialized business that requires unique technical expertise, including in relation to safety. The Debtors believe that without these payments, their workforce may become demoralized and unproductive because of the potential significant financial strain and other

hardships these Employees and Independent Contractors may face. Such individuals may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases. The Debtors respectfully request that the Court authorize the Debtors to pay and continue the Employee Compensation and Benefits in the ordinary course of business and consistent with past practice on a final basis from the outset of these cases.

128. The importance of a debtor's employees to its operations has been repeatedly recognized by courts in this district, and such courts have granted relief similar to the relief requested herein. *See, e.g.*, *In re Whiting Petroleum Corp.*, No. 20-32021 (DRJ) (Bankr. S.D. Tex. May 6, 2020) (authorizing the debtors to continue the employee compensation and benefits programs postpetition); *In re McDermott Int'l, Inc.*, No. 20-30336 (DRJ) (Bankr. S.D. Tex. Jan. 23, 2020) (same); *In re Sheridan Holding Co. II, LLC*, No. 19-35198 (MI) (Bankr. S.D. Tex. Sept. 16, 2019) (same); *In re Jones Energy, Inc.*, No. 19-32112 (DRJ) (Bankr. S.D. Tex. April 15, 2019) (same); *In re Vanguard Natural Res., Inc.*, No. 19-31786 (DRJ) (Bankr. S.D. Tex. April 2, 2019) (same).[13] The Debtors respectfully request that the Court

[13] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

authorize the Debtors to pay any prepetition amounts accrued and unpaid on account of the Employee Compensation and Benefits and to continue the Employee Compensation and Benefits postpetition in the ordinary course of business and consistent with past practices.

### III. The Debtors Seek a Waiver of the Automatic Stay as It Applies to Current Employees' Workers' Compensation Claims and Maintenance and Cure Claims.

129. Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]

Section 362 of the Bankruptcy Code permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

130. The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit current Employees to proceed with their workers' compensation claims and Maintenance and Cure Claims in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying the workers' compensation claims could have a detrimental effect on the financial well-being of Employees and Employee morale and lead to the departure of certain Employees who are critical at this juncture. Such departures could cause a severe disruption in the Debtors' businesses to the detriment of all parties in interest.

## Processing of Checks and Electronic Fund Transfers Should Be Authorized

131. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations, access to unencumbered cash, and anticipated access to debtor in possession financing. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the relief

requested herein. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

## Emergency Consideration

132. The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." The Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. The failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring. The Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

133. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

134. Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Notice**

135. The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) entities listed as holding the 30 largest

unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' revolving credit facility, and its counsel; (d) the indenture trustees for each of the Debtors' unsecured notes, and their respective counsel; (e) the Office of the United States Attorney for the Southern District of Texas; (f) the state attorneys general for states in which the Debtors conduct business; (g) the Internal Revenue Service; (h) the Securities and Exchange Commission; (i) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (j) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (k) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d). In light of the nature of the relief requested, no further notice is required.

**Conclusion**

The Debtors respectfully request that the Court enter the Interim and Final Orders, granting the relief requested herein and granting such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
August 19, 2020

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Kristhy M. Peguero (TX Bar No. 24102776)
Genevieve Graham (TX Bar No. 24085340)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: mcavenaugh@jw.com
kpeguero@jw.com
ggraham@jw.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (*pro hac* vice pending)
Ross M. Kwasteniet, P.C. (*pro hac* vice pending)
Spencer A. Winters (*pro hac* vice pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Local Rule 9013-1(i).

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

**Certificate of Service**

I certify that on August 19, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh