**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| VALARIS PLC, *et al.*[1] | ) | Case No. 20-34114 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**OBJECTION OF CITIBANK, N.A., AS AGENT,
TO DEBTORS' MOTION FOR ENTRY OF AN ORDER
(I) APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT,
(II) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH
RESPECT TO CONFIRMATION OF THE DEBTORS' PROPOSED JOINT PLAN OF
REORGANIZATION, (III) APPROVING THE FORMS OF BALLOTS AND NOTICES
IN CONNECTION THEREWITH, (IV) APPROVING THE RIGHTS OFFERING
PROCEDURES AND RELATED MATERIALS, (V) SCHEDULING CERTAIN
DATES WITH RESPECT THERETO, AND (VI) GRANTING RELATED RELIEF
[Relates to ECF Nos. 346, 347, 348, 558, and 695]**

Citibank, N.A., in its capacity as administrative agent (the "**RCF Agent**") under

that Fourth Amended and Restated Credit Agreement, dated as of May 7, 2013 (the "**RCF Credit**

**Agreement**"), by and among Valaris plc (formerly known as Ensco plc) and Pride International

LLC, as Borrowers, the RCF Agent and the financial institutions party thereto from time to time

(collectively, the "**RCF Lenders**," and together with the RCF Agent, the "**RCF Parties**"), by and

through its undersigned counsel, hereby objects to the *Debtors' Motion for Entry of an Order (I)*

*Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice*

*Procedures With Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization,*

*(III) Approving the Forms Of Ballots and Notices in Connection Therewith, (IV) Approving the*

*Rights Offering Procedures and Related Materials, (V) Scheduling Certain Dates With Respect*

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
claims and noticing agent at http://cases.stretto.com/Valaris.

*Thereto, and (VI) Granting Related Relief* [ECF No. 348] (the "**Motion**") seeking, among other things, approval of the *Disclosure Statement Relating to the Debtors' Joint Chapter 11 Plan Of Reorganization* [ECF No. 346] (as amended by the *Notice of Filing of (I) Limited Amendment to the Disclosure Statement Relating to the Debtors' Joint Chapter 11 Plan of Reorganization and (II) Certain Exhibits Thereto* [ECF No. 558] the "**Disclosure Statement**") for the *Debtors' Joint Chapter 11 Plan of Reorganization* [ECF No. 347].[2]  In support of its objection, the RCF Agent respectfully sets forth as follows.

## PRELIMINARY STATEMENT

1.      The Motion—which seeks approval of a Disclosure Statement and accompanying Solicitation and Voting Procedures (as defined in the Motion) with respect to the plans of reorganization for the Debtors (collectively, the "**Proposed Plans**")—is another step in the Debtors' unwavering pursuit of their fatally flawed prepetition deal with the ad hoc group of holders of the Debtors' Senior Notes (the "**Ad Hoc Group**").  The general terms of the Proposed Plans and the exit financing on which it is premised (the "**Ad Hoc Group Exit Financing**") date back to the Debtors' prepetition entry into the Restructuring Support Agreement with the Ad Hoc Group (the "**Restructuring Support Agreement**").  As the evidence adduced at the hearing (the "**DIP Hearing**") on the motion (the "**DIP Motion**")[3] seeking approval of the DIP Facility made clear, the plan structure in the Restructuring Support Agreement (as now embodied in the Proposed Plans), and the Ad Hoc Group Exit Financing on which it depends, were designed to achieve a capital structure that is untethered to the constraints of the Bankruptcy Code.

---

[2]     Capitalized terms used but not defined herein have the same meanings as in the *Debtors' Joint Chapter 11 Plan of Reorganization* [ECF No. 347].

[3]     *Motion for Entry of an Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Modifying the Automatic Stay, and (D) Granting Related Relief* [ECF No. 28].

2

2.      Notwithstanding the flaws in their plan structure and the Ad Hoc Group Exit Financing having been laid bare at the DIP Hearing, the Debtors, in a continued abdication of their fiduciary duties to all creditors, squandered nearly two months without engaging on alternative plan structures.  In fact, despite the Court having directed that David Kurtz of Lazard Frères & Co. LLC act as a facilitator of negotiations between the Debtors and the RCF Agent on a settlement of plan-related issues at the end of September, that request was virtually ignored until late November. Mr. Kurtz had one round of discussions with members of the steering committee of RCF Parties (the "**RCF Steering Committee**") prior to November, and then went into virtual hibernation until submitting a first formal settlement proposal to the RCF Steering Committee on November 20, 2020.[4]  In recent days, the Debtors finally appear to be engaging in plan discussions in a more serious manner; however, they do so against the backdrop of a ticking clock of their own creation, which is winding down to the currently proposed confirmation hearing date.  Thus, although it is difficult to discern with precision the Debtors' motivation for their ponderous approach to plan discussions, from the perspective of the RCF Agent, the current discussions appear to be less of a real set of negotiations than an effort by the Debtors to "check the box" while running out the clock on the confirmation timetable they set.

3.      The limited time that the Debtors spent engaging with alternative plan structures, however, appears to exceed the virtually non-existent efforts that they expended on fulfilling their specific duty to obtain alternate exit financing.  In fact, the RCF Agent is not aware of any efforts by the Debtors to seek exit financing from other parties since the Petition Date, even under the same flawed structure that underlies the Ad Hoc Group Exit Financing.  Indeed, in the

---

[4]      Contrary to the Debtors' characterization at the November 30, 2020, hearing that they and Mr. Kurtz had been working with the RCF Agent on an "ongoing" settlement process, the process had only just begun.  *See* Nov. 30 Hrg. Tr. at 5:25.

time since the DIP Hearing, the Debtors have not taken the minimal step of asking the RCF Parties whether they would be willing to provide exit financing under the same structure as the Ad Hoc Group Exit Financing.

4.       Rather than continuing to wait in vain for the Debtors to fulfill their duties, the RCF Agent delivered to the Debtors a proposal for exit financing provided by a group of RCF Parties using the current plan structure, a copy of which is annexed hereto as Exhibit "A" (the "**Exit Financing Counterproposal**").  The RCF Agent continues to maintain that there are capital structures that are far superior to the capital structure contained in the Proposed Plans with their reliance on the Ad Hoc Group Exit Financing, and that the valuation on which the recoveries in the Proposed Plans are based is massively overstated.[5]  Nevertheless, having tried unsuccessfully to get the Debtors to consider more appropriate capital structures and better exit financing, certain RCF Parties delivered the Exit Financing Counterproposal, which is on substantially identical terms as the Ad Hoc Group Exit Financing, but with 5% less "stapled equity."  With an identical structure to the Ad Hoc Group Exit Financing, but with a lower amount of "stapled equity," the Exit Financing Counterproposal indisputably is a better deal for the Debtors and their estates than the Ad Hoc Group Exit Financing.

5.       On the merits, the Motion should be denied because the Proposed Plans are patently unconfirmable and proceeding to solicit votes on them would be futile.  Even if the Court were to determine that the Proposed Plans were not patently unconfirmable, the Motion should be denied because the Disclosure Statement does not to meet the requirements of section 1125 of the

---

[5]       For the avoidance of doubt, the making of the Exit Financing Counterproposal should not be viewed as an endorsement of the structure and recoveries in the Proposed Plans.

Bankruptcy Code, as it not only fails to contain adequate information, but also is replete with misleading information.

6.     There are two key deficiencies with the Proposed Plans that not only permeate the disclosure in the Disclosure Statement, but also render the Proposed Plans patently unconfirmable.  *First*, the Proposed Plans proclaim that they are separate plans of reorganization for each Debtor, yet, beyond that window dressing, it is readily apparent that the Proposed Plans actually improperly ignore the separateness of the Debtors.  *Second*, the Proposed Plans are premised upon an Ad Hoc Group Exit Financing that is outrageously priced and, so far as the RCF Agent is aware, was never adequately shopped by the Debtors.

7.     The Proposed Plans explicitly self-identify as being separate and distinct plans of reorganization for each Debtor and clearly indicate that the Debtors are not seeking the substantive consolidation of their estates.  Yet, despite the unambiguous language to the contrary in both the Disclosure Statement and the Proposed Plans, the reality is that the Proposed Plans function as a single plan in a manner that completely ignores the guarantee claims that the RCF Parties have against the various Debtors that guaranteed the RCF Credit Agreement (collectively, the "**RCF Guarantor Debtors**").  That the Proposed Plans really are a single unified plan is most evident from the fact that the Proposed Plans seek to provide a single source of recovery—in the form of common equity of Valaris plc (the "**Post-Emergence Parent Equity**")—for all of the claims of the RCF Parties (collectively, the "**Credit Facility Claims**").  Such a single source of recovery completely ignores the Credit Facility Claims against the RCF Guarantor Debtors arising from the guarantees of the obligations under the RCF Credit Agreement from the RCF Guarantor Debtors (the "**RCF Guarantees**").

8.    A proposed recovery to the RCF Parties solely in the form of Post-Emergence Parent Equity not only ignores the separateness of the Debtors (including the RCF Guarantor Debtors), but also would result in the RCF Parties losing the structural seniority that they currently have as a result of the RCF Guarantees without just compensation.  Such a step-down of the priority of the Credit Facility Claims into Post-Emergence Parent Equity, which is a security that would be shared with structurally junior holders of Senior Notes (the "**Noteholders**"), directly contravenes long-standing Supreme Court precedent.

9.    The significance of the step-down in the recovery of the RCF Parties is exacerbated by the changes that the Debtors made to their proposed Management Incentive Plan, which accounts for 5 to 10% of the Post-Emergence Parent Equity.  Under the Proposed Plans, the Post-Emergence Parent Equity to be distributed to the RCF Parties would be subject to dilution by the Management Incentive Plan's shares.  Indeed, this dilution moves beyond the terms of the Restructuring Support Agreement, which provides that the shares under the Management Incentive Plan would dilute only the shares distributed to Noteholders and not those distributed to RCF Parties.[6]  The effect of this change is that even if the RCF Parties ultimately were found to receive a full recovery at confirmation (in a means permissible by the Bankruptcy Code given the separate nature of the Proposed Plans), such a "full" recovery would be illusory as it would immediately become subject to a 10% dilution from the Management Incentive Plan.  Notwithstanding the significance of that change on the RCF Parties' recoveries, the Disclosure Statement fails to

---

[6]    Under the Restructuring Term Sheet attached to the Restructuring Support Agreement, only the "Senior Note Equity Pool" was subject to dilution on account of the Management Incentive Plan while the recovery afforded on account of Credit Facility Claims was not.  *See* First Day Decl. at 93 of 302.  However, under the Proposed Plans, the Credit Facility Distributable Pool earmarked for RCF Parties is now expressly subject to dilution on account of the Management Incentive Plan.  *See* Proposed Plans at 9 of 59.

provide any disclosure on the reasons for the change in treatment of the RCF Parties' claims as compared to the treatment contained in the Restructuring Support Agreement.

10.     The single nature of the Proposed Plans also is reinforced by the dearth of debtor-by-debtor or "per plan" disclosure in the Disclosure Statement. Although debtor-by-debtor (*i.e.* per plan) detail may not be relevant in contexts where financial creditors have senior and junior claims at the same groups of debtors, this is not such a situation. Here, where financial creditors have different claims against different Debtors—most notably the Credit Facility Claims against the RCF Guarantor Debtors—it is critical that the creditors of each Debtor be provided with ample disclosure as to the claims against, and recoveries from, such Debtor in order to enable them to make an informed decision regarding each separate Proposed Plan.

11.     The complete lack of plan-by-plan disclosure is not limited just to the failure to include a description of the claims against, and anticipated recoveries from, each Debtor. The Disclosure Statement also neglects to describe how, if a class of creditors of a specific Debtor were to reject that Debtor's Proposed Plan, non-consensual confirmation would be pursued by that specific Debtor. This glaring omission is especially notable for each RCF Guarantor Debtor. It should be fully expected that a "no" vote from Class 3 (Credit Facility Claims) at all of the RCF Guarantor Debtors will be received, yet the Disclosure Statement offers no explanation for how cram down will be accomplished by each such Debtor. Under the Proposed Plans, each of the RCF Guarantor Debtor's respective equity holders will retain their equity interests in the various RCF Guarantor Debtors; however, the RCF Parties will receive no consideration from the RCF Debtor Guarantors, as the recovery to be provided to the RCF Parties under the Proposed Plans is entirely in Post-Emergence Parent Equity.

12.     The second major point that renders the Proposed Plans patently unconfirmable is that the Proposed Plans collectively are premised upon an Ad Hoc Group Exit Financing that is outrageously priced and which, so far as the RCF Agent is aware, was never adequately shopped after the Debtors entered into the Restructuring Support Agreement. There is no justification under the law for such a financing, and any further expenditure of time and effort on the Ad Hoc Group Exit Financing would be an exercise in futility.

13.     The fact is, there is no valid business justification for the Ad Hoc Group Exit Financing embodied in the Rights Offering. As set forth in greater detail herein, if the Rights Offering were to be consummated, the Backstop Parties would receive an incredible *$1.38 billion* (at the Debtors' purported plan value) worth of consideration in exchange for the $500 million in new money that is to be raised by the Rights Offering. That the Ad Hoc Group Exit Financing is nothing more than a blatant transfer of value to a select group of creditors at the expense of all of the Debtors' other creditors is even more evident today than when the Debtors first agreed to the Ad Hoc Group Exit Financing when they entered into the Restructuring Support Agreement in August.

14.     As the evidence adduced at the DIP Hearing made clear, under the business plan under which the Debtors were operating when they entered into Restructuring Support Agreement, the $500 million Ad Hoc Group Exit Financing provided an excessive amount of borrowed money. Since that time, however, the Debtors have adjusted their business plan to include an expected tax refund of more than $100 million, plus other positive adjustments, that greatly increase their projected cash over the term of the Ad Hoc Group Exit Financing, making $500 million in term financing all the more excessive.

15.    Even assuming that the Debtors could justify the excessive amount of the Ad Hoc Group Exit Financing, the Disclosure Statement fails to describe whether, or how, the Debtors sought (or failed to seek) alternatives to the Rights Offering.  Most notably, despite looking to cramdown the RCF Parties, the Disclosure Statement fails to disclose that the Debtors never asked the RCF Parties to provide the same basic exit financing on less expensive terms.  In fact, the Exit Financing Counterproposal makes clear how inadequate the Debtors' efforts to shop for exit financing really were.   The lack of information on any efforts to find alternative exit financing not only is a fatal flaw of the Disclosure Statement, but also is fatal to the Debtors' ability to meet their burden to establish that they used sound business judgment in obtaining the Ad Hoc Group Exit Financing.  Accordingly, the Debtors cannot establish that the Ad Hoc Group Exit Financing and associated Rights Offering Procedures are sound exercises of business judgment under section 363 of the Bankruptcy Code.

16.    In addition to the lack of recognition of the separateness of the various Debtors and the absurdly one-sided Ad Hoc Group Exit Financing, the Disclosure Statement also falls well short of providing adequate information on a variety of issues that are of critical importance for creditors.  One of the most notable deficiencies of the Disclosure Statement is that it contains false and misleading information about the size of the Credit Facility Claims. Throughout the Disclosure Statement, the size of the Credit Facility Claims is identified as being a fixed amount of $581 million.[7]  Such amount, however, ignores the $41.2 million of outstanding letters of credit issued under the RCF Credit Agreement, meaning that the Credit Facility Claims may be as high as $622 million.

---

[7]    In the Revised Summary of Expected Recoveries in Section III.D. of the Disclosure Statement, the "Projected Amount of Claims" is identified as $582.1 million.

17.    Another glaring deficiency of the Disclosure Statement is the lack of meaningful information on valuation.  Although the Debtors did file Exhibit F to the Disclosure Statement, which contains a valuation analysis (the "**Valuation Analysis**"), the Disclosure Statement remains woefully inadequate in the disclosure of relevant information regarding valuation.  For example, the Disclosure Statement provides no discussion of the relevant indices of valuation such as the trading prices of the Debtors' prepetition indebtedness.  In addition, the Disclosure Statement fails to describe (i) how the recovery of the RCF Parties—which is based upon the fixed 32.5% of Post-Emergence Parent Equity in the Credit Facility Distributable Pool—would be less than 100% of the amount of the Credit Facility Claims in the event that the Debtors collectively were valued at less than $1.79 billion, prior to giving effect to the dilution by the Management Incentive Plan, and (ii) the impact on recoveries of the RCF Parties from the newly-introduced dilution of the Management Incentive Plan on Credit Facility Claim recoveries. Finally, the Disclosure Statement omits any reference to the fact that the Debtors readily anticipate that the RCF Parties will be contesting valuation and that they believe it is significantly below even the plan value implied by the Restructuring Support Agreement.

18.    For these reasons, and for the additional reasons described in more detail below, the RCF Agent respectfully submits that the Motion should be denied.

## FACTUAL BACKGROUND

### A.    The Debtors' Prepetition Capital Structure

19.    The RCF Parties are party to the prepetition RCF Credit Agreement, under which Valaris plc is the borrower.  As of the Petition Date, the unpaid principal due under the RCF Agreement was approximately $581 million.  In addition, there were approximately $41.2 million of outstanding letters of credit issued under the RCF Credit Agreement.  Accordingly, as of the

Petition Date, there were outstanding obligations under the RCF Credit Agreement of not less than $622 million.

20.     Pursuant to the RCF Guarantees, the obligations of Valaris plc are guaranteed by: Pride International LLC; Ensco Jersey Finance Limited; Ensco Management Corp.; Pride Global II Ltd.; ENSCO Global GmbH; Ensco Intercontinental GmbH; ENSCO Worldwide GmbH; Alpha Achiever Company; Ensco Offshore International Company; ENSCO Overseas Limited; Ensco Ocean 2 Company; Rowan Offshore Luxembourg S.a.r.l.; and Rowan Rigs S.a.r.l. Of the 13 RCF Guarantor Debtors, 10 are rig-owning entities.  As a result of the RCF Guarantees, the Credit Facility Claims indisputably are "structurally senior" to the Debtors' pre-petition unsecured Senior Notes, which do not have the benefit of similar guarantees.

**B.     Lack of Plan Negotiations**

21.     On September 24 and 25, 2020, the Court held the DIP Hearing.  During the course of the DIP Hearing, in addition to raising issues regarding the DIP Facility, the RCF Agent demonstrated that there were serious issues regarding the Debtors' entry into the Restructuring Support Agreement and the plan structure contemplated thereunder (which now is the basis for the Proposed Plans).  At the conclusion of the DIP Hearing, the Court, while overruling the RCF Agent's objection to the DIP Facility, recognized the importance of the Restructuring Support Agreement-related issues raised by the RCF Agent, and ordered the Debtors' investment banker, David Kurtz of Lazard Frères & Co. LLC, to facilitate negotiations between the Debtors and the RCF Agent.[8]

22.     Unfortunately, contrary to the Court's order, following the DIP Hearing, rather than actively assuming the role of plan facilitator, the Debtors and Mr. Kurtz engaged in

---

[8]     Sept. 25 Hrg. Tr. at 121:12–25 and 122:1–9 [ECF No. 287].

what can best be described as a hibernation strategy. Indeed, although the Debtors characterized settlement discussions as "ongoing" at the November 30, 2020, hearing on their KEIP Motion,[9] at that time the process had only just begun.[10] After an initial set of conversations, the RCF Parties had no meaningful engagement with Mr. Kurtz during the entire month of October. During the nearly six-week delay following the conclusion of the DIP Hearing, rather than focusing on attempting to reach a consensual resolution of the RCF Agent's issues, the Debtors focused all of their plan-related energies on the Proposed Plans. After the six-week delay, on November 6, 2020, finally Mr. Kurtz began to engage in conversations on a plan settlement structure. Those discussions were preliminary in nature, and it was only after another two-week delay, on November 20, 2020, that Mr. Kurtz finally delivered a first settlement proposal to the RCF Parties.

C.      The Ad Hoc Group Exit Financing and the Exit Financing Counterproposal

23.      The Ad Hoc Group Exit Financing comprises $500 million of cash that is to be raised through the issuance of $550 million of New Secured Notes through the Rights Offering. The New Secured Notes are designed to be first lien notes issued by Valaris plc and guaranteed by other Debtors, including the RCF Guarantor Debtors.[11] The Rights Offering initially was backstopped by members of the Ad Hoc Group (the "**Initial Backstop Parties**") in accordance with the terms of the Restructuring Support Agreement. Under the Restructuring Support Agreement, to obtain the backstop commitment of the Initial Backstop Parties, the Debtors used their critically short prepetition liquidity to pre-fund a $20 million commitment fee into

---

[9]    *Debtors' Motion for Entry of an Order (A) Authorizing and Approving the Debtors' (A) Key Employee Incentive Plan and (B) Key Employee Retention Plan and (II) Granting Related Relief* [ECF No. 537] (the "**KEIP Motion**").

[10]   *See* Nov. 30 Hrg. Tr. at 5:25.

[11]   New Secured Notes Term Sheet; Motion at 323–25 of 597.

escrow (the "**Prepetition Cash Fee**").[12]  In the event that the Debtors close the funding of the New Secured Notes, the Prepetition Cash Fee will be "loaned" back to the Debtors and included in the principal amount of the New Secured Notes.[13]

24.     The New Secured Notes are designed to have a seven-year maturity and bear interest at 8.25% in cash, 10.25% (with 5.125% in cash and 5.125% PIK), or 12% PIK, at the Debtors' election.[14]  Although $500 million in new money is proposed to be raised in the Rights Offering, an additional $50 million (the "**Notes Premium**") will be issued such that the principal amount of the New Secured Notes at closing will be $550 million (after giving effect to the re-advancing of $20 million of cash that was funded into escrow without Court authorization prior to the Petition Date).[15]  Noteholders that purchase the New Secured Notes also will receive "stapled equity" equal to 30% of the Post-Emergence Parent Equity.[16]  Backstop Parties who signed onto the Restructuring Support Agreement before September 14, 2020 (together with the Initial Backstop Parties) will receive an additional 2.7% of the reorganized equity.[17]

25.     On December 10, 2020, the RCF Agent delivered the Exit Financing Counterproposal to the Debtors.  Although there are far superior capital structures than what is contemplated by the Proposed Plans and the Ad Hoc Group Exit Financing, given the Debtors' obstinate pursuit of the transactions contemplated by the Restructuring Support Agreement, the Exit Financing Counterproposal uses the capital structure contained in the Proposed Plans as model

---

[12]   Backstop Commitment Agreement § 3.1; Motion at 357 of 597.

[13]   Disclosure Statement at 23.

[14]   Senior Secured Notes Term Sheet; Motion at 323 of 597.

[15]   Disclosure Statement at 24.

[16]   *Id.* at 23.

[17]   *Id.* at 24; Press Release, Valaris, *Valaris plc Announces Additional Support for Restructuring and Extension of Joinder Period* (Sept. 11, 2020), https://www.valaris.com/news/news-details/2020/Valaris-plc-Announces-Additional-Support-for-Restructuring-and-Extension-of-Joinder-Period/default.aspx

and improves upon it, by making it significantly less expensive and allowing additional consideration to flow to other stakeholders. The Exit Financing Counterproposal, like the Ad Hoc Group Exit Financing, will raise $500 million of cash for the Debtors in return for first lien secured notes, with a seven-year maturity, bearing interest at 8.25% in cash, 10.25% (with 5.125% in cash and 5.125% PIK), or 12% PIK, at the Debtors' election. However, as a backstop fee, backstop parties to the Exit Financing Counterproposal will receive a 6.0% fee payable in kind (*i.e.*, $20 million less than the $50 million Notes Premium contemplated by the Ad Hoc Group Exit Financing) after they re-advance $20 million in a cash commitment fee that would be paid into escrow (similar to the fee payment structure in the Restructuring Support Agreement), in addition to the same 2.7% of the reorganized equity. The "stapled equity" consideration in the Exit Financing Counterproposal is 25%—500 basis points less than the 30% contemplated by the Proposed Plans and the Ad Hoc Group Exit Financing—a savings the Debtors should value at over $125 million based on the current midpoint enterprise value in the Debtors' Valuation Analysis. The additional 5% of stapled equity freed up by the Exit Financing Counterproposal would then be available as additional recoveries for other stakeholders.

## ARGUMENT

26. Under § 1125(b) of the Bankruptcy Code, a disclosure statement must contain "adequate information" before the Debtors may solicit acceptance of a plan of reorganization or liquidation. 11 U.S.C. § 1125(b). "Adequate information" is defined as being information of a kind, and in sufficient detail to the extent reasonably practicable in light of the nature and history of the debtor, to enable a hypothetically reasonable investor typical of the holders of claims or interests of the relevant class to make an informed judgment about a proposed chapter 11 plan of reorganization. *See* 11 U.S.C. § 1125(a)(1).

27.     The bankruptcy court has wide discretion in determining whether a disclosure statement has adequate information for approval and such determination should be made on a case-by-case basis. *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988), *cert. denied*, 488 U.S. 926 (1988); *see also Menard–Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694, 696 (4th Cir. 1989) (holding that "[t]he determination of whether the disclosure statement has adequate information is made on a case by case basis and is largely within the discretion of the bankruptcy court"). Factors courts consider in determining whether a disclosure statement contains adequate information under section 1125(b) of the Bankruptcy Code include: (i) the type and amount of financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan and (ii) information relevant to the risks posed to creditors under the plan. *See, e.g.*, *In re Divine Ripe, L.L.C.*, 554 B.R. 395, 401 (Bankr. S.D. Tex. 2016) (adopting as a non-exhaustive list the factors set forth in *In re Metrocraft Publishing Services, Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984)). A disclosure statement does not contain adequate information if it deprives objecting creditors of information that they may use to persuade others to vote against the proposed plan. *In re Perez*, 30 F.3d 1209, 1217 (9th Cir. 1994).

28.     Section 1125 also serves to prevent creditors from receiving misleading or false information. *See In re Applegate Prop., Ltd.*, 133 B.R. 827, 829 (Bankr. W.D. Tex. 1991) (holding that "disclosure statements which are misleading, or which contain unexplained inconsistencies, should not be approved"); *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 600 (Bankr. S.D.N.Y. 2006), *clarified on denial of reconsideration*, No. 02-41729, 2006 WL 2927222 (Bankr. S.D.N.Y. Oct. 10, 2006) (determining that "an adequate disclosure determination requires a bankruptcy court to find not just that there is enough information there, but also that what is said

is not misleading"); *In re M.E.S., Inc.*, 148 B.R. 1, 2 (D.P.R. 1992) (concluding that "[w]e find that the bankruptcy judge properly exercised her discretion not to approve the unopposed disclosure statement, as she had more than enough reason to believe that the statement contained serious inaccuracies"). As discussed in greater detail below, the Disclosure Statement clearly contains inadequate information for purposes of section 1125(b).

29.     A disclosure statement that describes a patently unconfirmable plan—as the Disclosure Statement here does relative to the Proposed Plans—should not be approved. Pursuing solicitation on a patently unconfirmable plan is "an exercise in futility [that] only serves to further delay a debtor's attempts to reorganize." *In re Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988). Accordingly, if a debtor seeks approval of a disclosure statement for "a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures." *Eastern Maine Elec. Co-op.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991); *see also In re Am. Capital Equip., LLC*, 688 F.3d 145, 148 (3d Cir. 2012) (holding that a bankruptcy court can determine at the disclosure statement stage that a chapter 11 plan is unconfirmable); *In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied, as solicitation of the vote would be futile."); *In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (denying disclosure statement describing plan that, among other infirmities, ran afoul of sections 1129(a)(4) and 1129(a)(11) of the Bankruptcy Code); *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992) ("A disclosure statement will not be approved where, as here, it describes a plan which is fatally flawed and thus incapable of confirmation"); *In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990) (declining to approve a disclosure statement for an unconfirmable plan). Thus, it has been observed that "a disclosure

statement should not be approved if the proposed plan, as a matter of law, cannot be confirmed." *In re Allied Gaming Mgmt., Inc.*, 209 B.R. 201, 202 (Bankr. W.D. La. 1997).

30.     Here, the Disclosure Statement both describes a patently unconfirmable joint plan and fails to provide adequate information for the Proposed Plans. The Motion, therefore, must be denied in its entirety.

## I.     THE PROPOSED PLANS IMPROPERLY IGNORE THE SEPARATENESS OF THE VARIOUS DEBTORS

31.     The Debtors are not seeking substantive consolidation of their estates. Indeed, the very first paragraph of the Disclosure Statement clearly states that: "The Plan constitutes a separate chapter 11 plan for each of the Debtors." Disclosure Statement at 12. The Proposed Plans likewise are clear and unequivocal about the separateness of the various plans, by stating:

- "*[T]he Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. … The Plan does not contemplate substantive consolidation of any of the Debtors.*" Proposed Plans at 1 (emphasis added).

- "*This Plan constitutes a separate Plan proposed by each Debtor.*" Proposed Plans at 19 (emphasis added).

The separateness of the Proposed Plans is required by applicable law, which is clear that "[i]n the absence of substantive consolidation, entity separateness is fundamental." *In re Tribune Co.*, 464 B.R. 126 at 182 (Bankr. D. Del. 2011).

### A.     The Proposed Plans Impermissibly Seek a *De Facto* Substantive Consolidation of the Debtors' Estates

32.     Contrary to their purported adherence to separateness, in actuality, the Proposed Plans seek to dissolve the separateness of the various Debtors' estates by treating all creditors of the various Debtors as if they are receiving a distribution from a pooled singular set of assets from all Debtors. Indeed, the Motion itself unabashedly states that "[t]he Plan provides for

the following distributions to be made to **the Debtors' stakeholders**" and then lists the recoveries without differentiating between claimants at various Debtors.  Motion ¶ 9 (emphasis added).

33.     The RCF Parties have claims against Valaris plc and each of the RCF Guarantor Debtors, not the Debtors as a whole.  And both the law and the Debtors' characterization of their Proposed Plans acknowledge that those claims must be addressed separately.  Even a cursory review of the Proposed Plans, however, makes clear that they are not.  The Proposed Plans—without the consent of the RCF Parties—would provide a recovery to the RCF Parties in the form of Post-Emergence Parent Equity, ignoring the reality that the RCF Parties have claims at each of the RCF Guarantor Debtors.  The Proposed Plans, therefore, effectively (but impermissibly) seek a *de facto* substantive consolidation of the various Debtors' estates without satisfying or even invoking the legal requirements for substantive consolidation, which of course cannot be satisfied here.[18]

34.     Quite simply, the Debtors cannot have their cake and eat it too.  They cannot claim to propound separate plans while effectuating a substantive consolidation.  *See In re N.S. Garrott & Sons*, 48 B.R. 13, 17–18 (Bankr. E.D. Ark. 1984) (denying confirmation on the basis that "[t]he plan is proposed as if these were not two separate debtors," and, without substantive consolidation having been approved prior to the confirmation hearing, confirmation of the joint plan would "circumvent[] basic due process").  As the Proposed Plans are separate plans for each of their estates, they must provide creditors with the appropriate disclosure on a per-Debtor basis.

35.     The RCF Parties are entitled to vote at such Debtors, and if (as expected) their class votes to reject the Proposed Plans at each of the RCF Guarantor Debtors, they are

---

[18]     Even if the Debtors were to seek substantive consolidation here—which they clearly indicate they are not—they would not be able to meet the legal standard.  As the Fifth Circuit has recognized, "substantive consolidation is an extreme and unusual remedy."  *In re Gandy*, 299 F.3d 489, 499 (5th Cir. 2002).

entitled to the protections of a dissenting class under section 1129(b) of the Bankruptcy Code from each RCF Guarantor Debtor.  Under section 1129(b)(1) of the Bankruptcy Code, in the event that an impaired class of creditors does not vote in favor of a plan, but all other requirements of section 1129(a) are satisfied, then the Court may only confirm the plan if it "does not discriminate unfairly, and is fair and equitable, with respect to" such class.  11 U.S.C. § 1129(b)(1).  Section 1129(b)(2) provides that a plan is "fair and equitable" with respect to a dissenting impaired class of unsecured creditors if no equity holder receives or retains any distribution under the plan "on account of" its junior claim or interest.  11 U.S.C. § 1129(b)(2)(B).

36.     The Credit Facility Claims at each of the RCF Guarantor Debtors are senior to the intercompany equity interests in the RCF Guarantors that are held by various Debtors (the "**Intercompany Interests**").  Accordingly, under the absolute priority rule embodied in section 1129(b), the RCF Guarantor Debtors cannot cramdown the Credit Facility Claims at any RCF Guarantor Debtor while leaving unimpaired the Intercompany Interests at such RCF Guarantor Debtor.  It is completely improper, therefore, that the Proposed Plans seek to cramdown the RCF Parties (by providing Post-Emergence Parent Equity from Valaris plc only), while preserving the Debtors' Intercompany Interests in each of the RCF Guarantor Debtors.

37.     Apart from providing thoroughly inadequate (if not thoroughly deceptive) disclosure relating to the *de facto* substantive consolidation that the Proposed Plans improperly seek to impose, the Disclosure Statement also fails to provide adequate information on a Debtor-by-Debtor basis.  For example:

- There is no discussion whatsoever regarding the separate pools of claims asserted against separate Debtors, which makes it impossible to determine whether the Credit Facility Claims are being discriminated against unfairly, including in

respect to the full payment of trade claims at each of the RCF Guarantor Debtors.[19]

- There is no separate liquidation analysis for any RCF Guarantor Debtor, as a reasonable creditor with subsidiary guarantees would expect to receive in order to evaluate its proposed recovery.[20]  Instead, the Liquidation Analysis attached as Exhibit D to the Disclosure Statement completely glosses over the structural seniority of the Credit Facility Claims as to rig-owning subsidiaries of the Debtors by providing that: "The Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered, but not substantively consolidated, proceeding"—but the "amounts received and distributed" to the disparate creditor groups "are reflected on a gross basis."  Liquidation Analysis, ECF No. 558 at 12 of 34.

- There also is no discussion of whether certain rigs are contracted at profitable rates and whether those potentially valuable rigs are assets of RCF Guarantor Debtors.

38.     This lack of information is especially problematic for the RCF Parties who have claims at the RCF Guarantor Debtors, including the 10 RCF Guarantor Debtors that own valuable rigs.   Without critical Debtor-by-Debtor and Proposed Plan-by-Proposed Plan information, the Disclosure Statement lacks adequate information for the RCF Parties to consider the Proposed Plans.  The Motion, therefore, should be denied.

**B.     The Proposed Plans Fail to Recognize the Structural Seniority of the Credit Facility Claims**

39.     The proposed step-down of the structurally senior position of the RCF Parties into Post-Emergence Parent Equity—consideration that is the same as would be received by the structurally junior Noteholders under the Proposed Plans—is completely improper and

---

[19]   For an example to the contrary, Noble Corporation plc ("**Noble**"), another major offshore drilling contractor in chapter 11 in this district with a similar capital structure (*i.e.*, unsecured but structurally senior bank debt in addition to unsecured notes), filed a disclosure statement that contained such a discussion and adopted an appropriate classification scheme.  *Disclosure Statement with Respect to the Amended Joint Plan of Reorganization of Noble Corporation plc and its Debtor Affiliates* at 3–6, *In re Noble Corp.*, No. 20-33826 (Bankr. S.D. Tex. Oct. 8, 2020) ("**Noble Disclosure Statement**") [ECF No. 520].

[20]   Noble's liquidation analysis in its disclosure statement contained such separate, debtor-by-debtor, analyses. Noble Disclosure Statement, Ex. B at 7–13 [ECF No. 520-2].

renders the Proposed Plans patently unconfirmable. Long-standing Supreme Court precedent makes clear that rights of senior creditors (such as the RCF Parties) must be recognized ***not only in the form of their recovery, but also in the amount of their recovery***. *See Grp. of Institutional Inv'rs v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 318 U.S. 523, 563, 63 S. Ct. 727, 748 (1943) (holding, with respect to two sets of prepetition bondholders, that "it is necessary to fit each into the hierarchy of the new capital structure in such a way that each will retain in relation to the other the same position it formerly had in respect of assets and of earnings at various levels"); *Consol. Rock Prod. Co. v. Du Bois*, 312 U.S. 510, 528–29, 61 S. Ct. 675, 686 (1941) (concluding that "it is plain that while creditors may be given inferior grades of securities, their 'superior rights' must be recognized"). By seeking to provide a recovery of Post-Emergence Parent Equity to satisfy the senior Credit Facility Claims, the Proposed Plans are attempting an improper end-run around these long-standing precedents.

40.     Even if (despite the infirmities of pursuing a *de facto* substantive consolidation) the Debtors could be viewed as a singular entity, and even if (despite the infirmities of stepping down senior creditors) the RCF Parties could be given the same inferior securities (such as the Post-Emergence Parent Equity) as the holders of the structurally junior Senior Notes are receiving, the RCF Parties must be compensated (or stepped-up) in their recovery to compensate for the surrendered senior rights in order for the Proposed Plans to be "fair and equitable." *Cosol. Rock Prod. Co. v. Du Bois*, 312 U.S. at 529 (holding that senior creditors "must receive … compensation for the senior rights which they are to surrender"); *see also Citibank, N.A. v. Baer*, 651 F.2d 1341, 1348 (10th Cir. 1980) (holding that senior prepetition creditors' recovery of stock with a liquidation preference and conversion feature was proper over objection of junior creditors because, "even if the senior debt holders received property with an 'equitable

value' in excess of the amount of their claims, that excess can be justified as compensation for the seniority rights they have surrendered"); *In re Inland Gas Corp.*, 211 F.2d 381, 385 (6th Cir. 1954), *cert. denied*, 348 U.S. 840, 75 S. Ct. 45, (1954) (senior creditors receive inferior securities worth 110% of their allowed claims); *Standard Gas & Elec. Co. v. Deep Rock Oil Corp.*, 117 F.2d 615, 617 (10th Cir. 1941), *cert. denied*, 313 U.S. 564, 61 S. Ct. 842 (1941) (senior creditors receive inferior securities worth 104% of their allowed claims); *In re Imperial '400' Nat'l, Inc.*, 374 F. Supp. 949, 976–77 (D.N.J. 1974) (senior creditors receive inferior securities worth 110% of their allowed claims).[21]

       41.    The Proposed Plans' step-down of Credit Facility Claims is magnified by the fact that **all** Post-Emergence Parent Equity, including the Post-Emergence Parent Equity in the Credit Facility Distributable Pool, is subject to further dilution on a *pari passu* basis to the Post-Emergence Parent Equity to be received by participants in the Management Incentive Plan.  Under the Restructuring Support Agreement, however, the recovery for Credit Facility Claims was not

---

[21]    Although the cases implementing step-ups predate the Bankruptcy Code, their holdings retain vitality.  The Supreme Court has held that the Bankruptcy Code did not invalidate pre-Bankruptcy Code judicially created practice unless there was "at least some discussion" in the legislative history of congressional intent to make such a change.  *Midlantic Nat'l Bank v. New Jersey Dep't of Environmental Protection*, 474 U.S. 494, 501, 106 S. Ct. 755, 759 (1986).  In *Midlantic Nat'l*, the Court held that:

> The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific. … The Court has followed this rule with particular care in construing the scope of bankruptcy codifications.

*Id.*  Indeed, the congressional record of section 1129(b) shows that "[t]he partial codification of the absolute priority rule [was] not intended to deprive [the] senior creditor of compensation for being required to take securities in the reorganized debtor that are of an equal priority with the securities offered to a junior class."  H.R. Rep. 95-595, 95th Cong. 1st Sess. 412, 414 (1977); *see also* 124 Cong. Rec. at 32,407 (statement of Rep. Edwards) and 34,006 (statement of Sen. DeConcini) (each noting, "many of the factors interpreting 'fair and equitable' …, which were explicated in the description of section 1129(b) in the House report, were omitted from [1129(b)(2) in] the House amendment to avoid statutory complexity …. [T]he deletion is intended to be one of style and not one of substance."); *Matter of D & F Const. Inc.*, 865 F.2d 673, 675 (5th Cir. 1989) (holding, "technical compliance with all the requirements in § 1129(b)(2) does not assure that the plan is 'fair and equitable.'").

diluted by the Management Incentive plan.[22]  The effect of this change is that recoveries for the RCF Parties would immediately become subject to a 10% dilution from the Management Incentive Plan.

42.     The belated efforts made in the Valuation Analysis to demonstrate a step-up in recovery should be viewed as what they are: a transparent justification for the inflated "plan-value" utilized to determine the recovery for the Credit Facility Claims.  As discussed in greater detail below, the Valuation Analysis, while magically lifting the aggregate enterprise valuation of the Debtors' estates by approximately one-third as compared to the enterprise valuation implied by the Restructuring Support Agreement, fails to account for the fact that the current trading prices of unsecured claims against the Debtors imply a dramatically lower enterprise valuation.  In reality, the Proposed Plans do not come close to providing a step-up in recovery to compensate the RCF Parties for the loss of their structural seniority.  Accordingly, the treatment provided for the RCF Parties renders the Proposed Plans patently unconfirmable.

## II.     THE AD HOC GROUP EXIT FINANCING'S EGREGIOUS EXPENSE CANNOT BE JUSTIFIED, WHICH RENDERS THE PROPOSED PLANS THAT DEPEND UPON IT PATENTLY UNCONFIRMABLE

43.     As the Ad Hoc Group Exit Financing is a central part of the Proposed Plans,[23] without court approval of the Ad Hoc Group Exit Financing, the Proposed Plans must also fail.  Approval of the Ad Hoc Group Exit Financing, however, will require a finding by the Court that entering into it was an appropriate exercise of the Debtors' sound business judgment, because exit financings in general are subject to a business judgment standard pursuant to section 363 of the Bankruptcy Code.  *See, e.g.*, *In re EXCO Resources*, Case No. 18-30155 (MI) (Bankr. S.D.

---

[22]     *See* supra n.6.

[23]     *See* Plan § IV.C.1.

Tex. May 20, 2019) [ECF No. 1957] (final order granting Debtors authority to enter into and perform under exit financing agreements pursuant to section 363 of Bankruptcy Code); *In re Ultra Petroleum Corp.*, Case No. 16-32202 (MI) (Bankr. S.D. Tex. Feb. 14, 2017) [ECF No. 1126] ("Entry into the Exit Financing Agreements is a reasonable exercise of the Debtors' business judgment."); *In re CJ Holding Co.*, Case No. 16-33590 (DRJ) (Bankr. S.D. Tex. Dec. 2, 2016) [ECF No. 901] (same).

44.     A finding that the Debtors exercised sound business judgment for purposes of section 363 of the Bankruptcy Code, however, never could be made under the circumstances. The Ad Hoc Group Exit Financing represents horrendously unsound business judgment by the Debtors, if not a complete abdication of their fiduciary duties to all creditors.  As such, the Proposed Plans, due to their dependency on the Ad Hoc Group Exit Financing, are patently unconfirmable.  As a result, denial of the Motion is appropriate as it relates to the Disclosure Statement, but also as it relates to the Rights Offering Procedures and any other relief with respect to the Ad Hoc Group Exit Financing.

45.     The Ad Hoc Group Exit Financing is unprecedented in its cost and the largesse it bestows on those who participate in the Rights Offering, all of whom are structurally junior creditors.  The fact that the Debtors are pursuing that financing from junior creditors, while the senior RCF Parties—as to whom the Debtors are seeking to cramdown with Post-Emergence Parent Equity as the sole consideration—are willing and able to provide the same financing on better terms, by itself is impossible to justify, other than as an improper transfer of value to the junior creditors.  The lack of support of the senior creditors, and the fact that the Debtors' senior creditors here, as evidenced by the Exit Financing Counterproposal, would be willing to provide the Ad Hoc Group Exit Financing on better terms than the junior creditors, make the Ad Hoc

Group Exit Financing unlike anything in the marketplace,[24] which is an additional incurable defect of the Ad Hoc Group Exit Financing and the Proposed Plans that are dependent upon it.

46.     The Rights Offering seeks to raise $500 million of new capital in the form of the New Secured Notes, which will bear interest at rates between 8.25% and 12%. As additional consideration, Noteholders who participate in the Rights Offering will receive an additional $50 million Notes Premium **plus** their share of the 30% of the Post-Emergence Parent Equity (the "**Stapled Equity**"), which, under the current midpoint enterprise value in the Debtors' Valuation Analysis (the "**Asserted Enterprise Value**") of $2.475 billion, would be worth $761.4 million (or ranging between $576.9 million on the low end and up to $962.4 million on the high end, based on the range of values asserted in the Valuation Analysis).[25]  In addition, the Backstop Parties will receive an additional 2.7% of the Post-Emergence Parent Equity (the "**Backstop Stock Premium**"),[26] which under the Asserted Enterprise Value would be worth $68.5 million.  Under the terms of the Rights Offering, therefore, the Backstop Parties will receive an incredible $1.38 billion worth of value (using the Asserted Enterprise Value) in the form of New Secured Notes (including the Notes Premium), Stapled Equity, and Backstop Stock Premium for the $500 million in new money that is to be raised in the Rights Offering.

---

[24]   Although similar looking on the surface to the second-lien notes rights offering contemplated in the chapter 11 cases of Noble and its affiliates, the distinctions between the plan structure and exit financing in Noble when compared to the Proposed Plans and the Ad Hoc Group Exit Financing are manifest.  In Noble, the proposed exit financing comprises $200 million in **second-lien notes**; noteholders who participate in the rights offering will also receive 30% of the equity in reorganized Noble; and those who backstop it receive 8% of the second-lien notes as a premium.  *See Noble Corporation plc Backstop Term Sheet*, Ex. C to *Restructuring Support Agreement* at 63 of 82, *In re Noble Corp.*, No. 20-33826 (Bankr. S.D. Tex. Aug. 1, 2020) [ECF No. 28-1].  However, unlike the treatment under the Proposed Plans, the Noble debtors' senior lenders will receive cash on account of their prepetition claims (from proceeds of a new first-lien exit revolving credit facility that they provide), while the structurally junior noteholders that participate in the exit financing will receive second-lien notes, which would remain structurally junior to the exit revolving credit facility.  *See* Noble Disclosure Statement at 6-12.

[25]   These numbers include $63 million in net cash on top of the asserted valuations from the Valuation Analysis.

[26]   As noted herein, the RCF Agent does not believe that the Debtors will be able to sustain a valuation at even the low end of the range in the Valuation Analysis, and certainly not at the Asserted Enterprise Value.

47.     The Initial Backstop Parties receive additional special treatment under the Ad Hoc Group Exit Financing.  Although all Backstop Parties will have the right to purchase the "Holdback" of 37.5% of the New Secured Notes (which would include the Notes Premium and be accompanied by a *pro rata* share of the Stapled Equity and the Backstop Premium), the Initial Backstop Parties would not have their share of the Holdback diluted in the event that Noteholders entitled to receive more than 23% of the shares being distributed to all Noteholders under the Proposed Plans were to become Backstop Parties.[27]

48.     The Disclosure Statement is devoid of any explanation of why the Debtors have not sought a more flexible and less expensive source of exit financing that is better suited to the Debtors' actual business needs than the proposed New Secured Notes (or the notes contemplated by the Exit Financing Counterproposal).  Specifically, the Disclosure Statement fails to explain why the Debtors' unflinchingly have remained committed to obtaining a seven-year note rather than a market rate revolving credit facility, particularly in light of the fact that the Financial Projections filed as Exhibit E to the Disclosure Statement demonstrate little need for cash in the early years of the projection period and show cash at a level above $530 million through 2025.  Moreover, under a revolving credit facility, letters of credit presumably would be available relatively inexpensively, and likely would have a sublimit for letters of credit.  Indeed, although the Debtors gave short shrift to the cost of letters of credit in connection with the DIP Hearing,[28] the high cost of obtaining cash collateralized letters of credit has been revealed.[29]

---

[27]   Restructuring Term Sheet at 2; Motion at 245 of 597.

[28]   *See* Sep. 24 Hrg. Tr. 57:8–14 [ECF No. 283].

[29]   *See Statement of Citibank, N.A., as Agent, With Respect to Debtors' Motion for Entry of an Order (I) Authorizing Debtors Rowandrill, LLC and Ensco International, Inc. to Enter into Secured Letter of Credit Facility Agreements, (II) Modifying the Automatic Stay with Respect Thereto, and (III) Granting Related Relief* [ECF No. 743].

49.     Apart from the structure of the Ad Hoc Group Exit Financing, the $500 million size of it appears to be much more than needed because the Debtors have adjusted their business plan since negotiating the Restructuring Support Agreement to include more than $100 million in additional cash savings over the term of the Ad Hoc Group Exit Financing, including an expected tax refund of more than $100 million.  The Ad Hoc Group Exit Financing, as poorly constructed excessive term financing, will serve as an albatross around the neck of all future holders of Post-Emergence Parent Equity.

50.     Even if the Debtors doggedly were to continue to assert that a 7 year note, that is designed to do nothing other than fit within the Debtors' self-contrived metrics, is what they consider the most appropriate form of exit financing, the Disclosure Statement fails to disclose what efforts the Debtors undertook after the Petition Date to see if such a loan was available on better terms.  That omission likely is due to the Debtors being unable describe any such efforts, because in reality, it appears that none were undertaken by the Debtors themselves.

51.     The record from the DIP Hearing is clear that from day one the Debtors myopically were focused on only a full-equitization plan, with exit financing provided by the Ad Hoc Group, and only the Ad Hoc Group.[30]  Such a narrow focus on only one plan alternative left the Debtors exposed to the poor judgment of locking themselves into a devastatingly overpriced financing before these cases began.   Adding an illusory "fiduciary out" to the Restructuring Support Agreement did nothing to rescue the Debtors from the own poor business judgment.  In fact, despite the RCF Agent having indicated in its objection to the DIP Motion that it believes that the RCF Parties would be willing to provide exit financing on the same terms as the Ad Hoc Group

---

[30]    *See* Sep. 24 Hrg. Tr. 110:7–16 [ECF No. 283].

Exit Financing, except with *less* Stapled Equity,[31] the Debtors have not approached the RCF Parties to pursue such a less expensive exit financing.

52.     The lack of meaningful efforts to shop the Ad Hoc Group Exit Financing lays bare that the oversized returns going exclusively to the Noteholders must be viewed as what they are—an improper payment to a select group of creditors on account of their existing claims. *See Dish Network Corp. v. DBSD N. Am. Inc. (In re DBSD N. Am. Inc.)*, 634 F.3d 79, 96 (2d Cir. 2011) (holding that "a transfer partly on account of factors other than the prior interest is still partly 'on account of' that interest"). When special consideration is given to a creditor at the expense of other creditors in the same class, a fundamental principle of the Bankruptcy Code—that similarly situated creditors should be treated equally in the bankruptcy process—is at risk. *See In re Lakeside Cmty. Hosp., Inc.*, 151 B.R. 887, 893 (Bankr. N.D. Ill. 1993) ("Congress designed the Bankruptcy Code to provide for equal and consistent treatment among similarly situated creditors"). The special consideration being made exclusively to the Noteholders (with additional consideration to Backstop Parties and the Initial Backstop Parties), but not the RCF Parties, as the senior creditors in this case, is impermissible unequal treatment. *See In re Sentry Operating Co. of Texas, Inc.*, 264 B.R. 850, 863–64 (Bankr. S.D. Tex. 2001) (holding that unfair discrimination occurs when a dissenting class receives a materially lower percentage recovery or an allocation of materially greater risk).

### III.    THE DISCLOSURE STATEMENT LACKS ADEQUATE INFORMATION FOR APPROVAL ON OTHER IMPORTANT TOPICS

53.     Assuming *arguendo* that the Debtors, despite the strong evidence to the contrary, could satisfy the Court that the Proposed Plans are not patently unconfirmable, and that

---

[31]     *Objection of Citibank, N.A., as Agent, to Debtors' Motion For Entry of an Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Modifying the Automatic Stay, and (D) Granting Related Relief* at ¶ 15 [ECF No. 205].

there is adequate information on the matters discussed above (*i.e.* the debtor-by-debtor issues and the Ad Hoc Group Exit Financing), the Disclosure Statement lacks adequate information on several other topics that are critical to creditors, including the RCF Parties. The lack of such adequate information mandates the denial of the Motion.[32]

A. **The Disclosure Statement Fails to Disclose the Likelihood that the Fixed Percentage of Post-Emergence Parent Equity Will Not Provide a 100% Recovery for Credit Facility Claims**

54. The Debtors, under their own misplaced legal theory that they could lawfully satisfy the structurally senior Credit Facility Claims with Post-Emergence Parent Equity absent the consent of the RCF Parties, cannot do so with equity worth less than 100% of the amount of such claims. Here, because under the Proposed Plans Credit Facility Claims would receive a fixed percentage of Post-Emergence Parent Equity, if the actual valuation is any number less than $2.1 billion[33] (after giving effect to the dilution from the Management Incentive Plan, as discussed below), the Credit Facility Claims would receive value under the Proposed Plans of less than 100%. Although the Valuation Analysis indicates a midpoint Asserted Enterprise Value of approximately $2.475 billion, the Disclosure Statement fails to disclose that Asserted Enterprise Value is not supported by current trading prices of the Credit Facility Claims or Senior Notes Claims, which indicate an aggregate enterprise value for the Debtors of at most $1 billion. At the enterprise value reflected by current trading prices (and assuming Credit Facility Claims are only $581 million), the RCF Parties would have to receive 54.7% of the Post-Emergence Parent Equity in order to receive a full recovery on their Credit Facility Claims. The implications of a valuation

---

[32]   The RCF Agent, in an effort to resolve other documentary objections, expects to provide a mark-up of the Disclosure Statement to the Debtors prior to the hearing on the Motion.

[33]   Assuming outstanding letters of credit under the RCF Credit Agreement are drawn; if undrawn, the number is $1.9 billion.

in that range are manifest: A fixed recovery of 32.5% of the Post-Emergence Parent Equity would be worth significantly less than the full value of the Credit Facility Claims.[34]

### B.     The Disclosure Statement Understates the Size of the Credit Facility Claims

55.     Throughout the Disclosure Statement, the size of the Credit Facility Claims is identified as being a fixed amount of $581 million.[35]  In actuality, the amount of prepetition obligations outstanding under the RCF Credit Agreement currently is approximately $622 as the Disclosure Statement inexplicably excludes approximately $41.2 million in issued but undrawn letters of credit under the RCF Credit Agreement.  If any of those letters of credit were to be drawn, it would increase the size of the Credit Facility Claims on a dollar-for-dollar basis above the $581 million in outstanding principal.  By excluding any amount for issued but undrawn letters of credit, the Disclosure Statement contains an arbitrarily low claim amount for the Credit Facility Claims.

### C.     The Recoveries on Credit Facility Claims Described in the Disclosure Statement Do Not Account for Dilution from the Management Incentive Plan

56.     The Disclosure Statement further distorts the asserted recovery amounts by not accounting for the dilution that results from the Management Incentive Plan.  As discussed above, contrary to the wording in the Restructuring Support Agreement, the Proposed Plans now seek to make the Post-Emergence Parent Equity to be received by the RCF Parties subject to dilution from the Management Incentive Plan.  As currently contemplated, the Management Incentive Plan will be between 5 and 10% of the outstanding equity, which means that any

---

[34]     *See VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) (characterizing trading prices on company's securities as "objective evidence from the public equity and debt markets" and holding them to be "a more reliable measure" of value than "subjective estimates of one or two expert witnesses"); *In re Iridium Operating LLC*, 373 B.R. 283, 293 (Bankr. S.D.N.Y. 2007) ("the public trading market constitutes an impartial gauge of investor confidence and remains the best and most unbiased measure of fair market value").

[35]     In the Revised Summary of Expected Recoveries in Section III.D. of the Disclosure Statement, the "Projected Amount of Claims" is identified as $582.1 million.

recovery by the RCF Parties will be further diluted.[36]  The Debtors, however, fail to account for that dilution in determining the recovery percentages of the RCF Parties that are described in the Disclosure Statement.

D.     **The Disclosure Statement Lacks Disclosure Regarding a Contested Valuation**

57.     In addition to the foregoing defects of the Disclosure Statement, the Disclosure Statement also lacks any disclosure regarding the risks to plan confirmation in the face of a highly contested valuation.  The Debtors have been well aware—and if they were not previously aware, they should be aware now—that the RCF Agent will vigorously object to confirmation.  The RCF Agent has repeatedly made clear that it does not agree with the valuation proposed in the Restructuring Support Agreement and the Proposed Plans.  Among the issues that will be contested is the calculation of the Asserted Enterprise Value.  The lack of disclosure on this point alone is enough to warrant denial of the Disclosure Statement.  *See In re Fullmer*, 09-50086, 2009 WL 2778303, at *2 (Bankr. N.D. Tex. Sept. 2, 2009) (denying a disclosure statement that did not provide a prominent disclosure of a major creditor's dispute regarding the effect of a settlement).[37]

## RESERVATION OF RIGHTS

58.     The objections set forth herein are limited to the RCF Agent's objections to the Disclosure Statement and are not intended, nor should they be construed, to represent all of the objections the RCF Agent may have to the Proposed Plans or any other chapter 11 plan or plans the Debtors may file.  The RCF Agent reserves all its rights with respect thereto.  This objection

---

[36]     Restructuring Support Agreement Ex. 6; Motion at 412 of 597.

[37]     *See, e.g., Third Amended Disclosure Statement for the Debtors' Proposed Joint Chapter 11 Plan of Reorganization* at § X.H, 158–64 of 515, *In re Energy XXI LTD*, No. 16-31928 (Bankr. S.D. Tex. Jul. 15, 2016) [ECF No. 805] (detailed disclosure of the issues related to valuation disputes expected to arise at plan confirmation).

is further submitted without prejudice to, and with a full reservation of, the RCF Agent's rights, claims, defenses, and remedies, including the right to amend, modify, or supplement this objection, to raise additional objections and to introduce evidence at any hearing relating to the Motion, and without in any way limiting any other rights of the RCF Agent to further object to the Motion, including with respect to any amendments that may be made to the Disclosure Statement and the Proposed Plans, and the proposed form of order with respect to the Motion.

## <u>CONCLUSION</u>

For the foregoing reasons, the RCF Agent respectfully requests that the Court enter an order denying the adequacy of the Disclosure Statement, denying the Rights Offering Procedures, and granting such other and further relief as may be just and proper.

Dated: December 10, 2020
Houston, Texas

SHEARMAN & STERLING LLP

By: */s/ Lauren Randle* _____

Lauren Randle
Texas Bar No. 24074931
Southern Dist. of Texas Bar No. 1331536
SHEARMAN & STERLING LLP
2828 North Harwood Street, 18th floor
Dallas, Texas 75201
Telephone:  214.271.5777
Email:  lauren.randle@shearman.com

Fredric Sosnick (admitted *pro hac vice*)
Daniel H.R. Laguardia (admitted *pro hac vice*)
Ned S. Schodek (admitted *pro hac vice*)
Grace J. Lee (admitted *pro hac vice*)
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
Telephone:  212.848.4000
Email:  fsosnick@shearman.com
            ned.schodek@shearman.com
            daniel.laguardia@shearman.com
            grace.lee@shearman.com

*Attorneys for Citibank, N.A. as Administrative Agent*

## Certificate of Service

I certify that on December 10, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Lauren Randle
Lauren Randle
