**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
01/22/2021

|  |  |
|---|---|
| In re: | Chapter 11 |
| VALARIS PLC, *et al.*,[1] | Case No. 20-34114 |
| Debtors. | (Jointly Administered) |
|  | **Re: Docket No. 874** |

**ORDER (I) APPROVING THE SALE OF CERTAIN OF
THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES, AND INTERESTS AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"): (a) approving the Agreement by and between Ensco and the Buyer; (b) authorizing the Debtors' sale of certain of its property free and clear of liens, claims, encumbrances, and interests on the terms set forth in the Agreement; and (c) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution**;** and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.stretto.com/Valaris. The location of Debtor Ensco Incorporated's principal place of business and the Debtors' service address in these chapter 11 cases is 5847 San Felipe Street, Suite 3300, Houston, Texas 77057.

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion  and in the Mooney Declaration; and this Court having determined that the legal and factual bases set forth in the Motion a establish just cause for the relief granted herein;  and  upon  all  of  the proceedings  had  before  this  Court;  and  after  due  deliberation  and  sufficient  cause  appearing therefor, it is HEREBY ORDERED THAT:

1.     The Agreement attached hereto as **Exhibit 1** is approved in all respects.  The Debtors are authorized, but not directed, to take any and all actions necessary, appropriate, or desirable to (a) consummate the Sale in accordance with the terms and conditions set forth in the Agreement; and (b) otherwise implement and effectuate the terms of the Agreement.

2.     Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, upon the closing of the Sale, all of the Debtors' right, title, and interest in and to, and possession of, the Rig shall be transferred to the Buyer free and clear of any and all liens, claims, encumbrances, and interests, with any such liens, claims, encumbrances, and interests to attach to the proceeds of the Sale in the order of their priority, with the same force, effect, and validity that they had immediately prior to the entry of this Order, subject to any rights, claims, or defenses the Debtors may have with respect thereto.  Such transfer shall constitute a legal, valid, binding, and effective transfer of the Rig.

3.     This Order shall be effective as a determination that, as of the closing of the Sale, (a) no liens, claims, encumbrances, or interests will be assertable against the Buyer or any of its respective assets, including the Rig; and (b) the Rig shall have been transferred to the Buyer free and clear of all liens, claims, encumbrances, and interests.

4.      This Order is and shall be binding upon all persons and entities that may be required by operation of law, the duties of their office, or contract to accept, file, register, or otherwise record or release any documents or instruments, or that may be required to report or insure any title or state of title in or to any property; and each of the foregoing persons and entities shall accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Sale.

5.      The Buyer is deemed to be a good faith purchaser of the Rig.  Pursuant to section 363(m) of the Bankruptcy Code, if this Order is reversed or modified on appeal, such reversal or modification shall not affect the validity of the Sale.  The consideration provided for the Rig under the Agreement is fair and reasonable, and the Sale is not subject to avoidance under section 363(n) of the Bankruptcy Code or otherwise.

6.      To the extent there are any inconsistencies between this Order and the Agreement, the terms of this Order shall control.

7.      Notwithstanding anything to the contrary contained in the Motion or this Order, any payment to be made or obligation, relief or authorization granted hereunder shall not be inconsistent with, and shall be subject to, the requirements imposed on the Debtors under the terms of any interim or final orders entered by the Court in these chapter 11 cases approving any postpetition financing, and any budget in connection therewith.  To the extent there is any conflict between this Order and any such financing orders or budget, the financing orders or the budget, as applicable, shall govern.

8.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion, and the requirements of the Bankruptcy Rule and the Bankruptcy Local Rules are satisfied by such notice.

9.     Notwithstanding any Bankruptcy Rule or Bankruptcy Local Rule to the contrary, the terms and conditions of this Order are immediately effective and enforceable upon its entry.

10.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.  Notwithstanding anything to the contrary contained in the Motion or this Order, any intercompany transfers by the Debtors of the consideration received from the Buyer in connection with the Sale of the Rig shall be subject to the requirements, protections, and recording obligations set forth in the *Final Order Granting Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions and (II) Granting Related Relief* [Docket No. 251]  (the "Cash Management Order").  To the extent that there is any conflict between this Order and the Cash Management Order, the Cash Management Order shall govern.

11.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

  Signed: January 22, 2021

Marvin Isgur
United States Bankruptcy Judge

## Exhibit 1

**Memorandum of Agreement**

**MEMORANDUM OF AGREEMENT**

in respect of the sale and purchase of the jack-up drilling unit Ensco 101

Date:      December  2020

1.      Ensco Offshore International Company, a Cayman Islands limited liability company, having an address of 1 Capital Place, 3rd Floor, P.O. Box 1564, Cayman Islands, KY1-1110 (hereinafter referred to as the "**Seller**"); and

2.      JSC "Arktikmorneftegazrazvedka", a company incorporated in and under the laws of Russia, having its office at 33/3 Akademika Knipovicha Street, Murmansk, 183039, Russia (the "**Buyer**").

Subject to the terms and conditions set forth below the Seller has agreed to sell and the Buyer

has agreed to buy:

**Name: Ensco 101**

| | |
|---|---|
| **Classification Society: ABS** | **Class Notation: ✠A1,Self Elevating Drilling Unit** |
| **Year of Build: 2000** | **Builder/Yard: KEPPEL FELS LTD.** |
| **Flag: The Republic of Liberia** | **Port of Registry: Monrovia** |
| **Call Sign: ELWV5** | **GT/NT: 11827 / 3548** |
| **Official Number:  11107** | **IMO Number: 8764779** |

with all equipment as set forth in Clause 6, hereinafter called the "**Vessel**", on the following terms and conditions:

**Definitions:**

In this Agreement, the following words and expressions shall have the following meanings:

"**ABS**" means the American Bureau of Shipping.

"**Affiliate**" means with respect to one of the Parties hereto, any other person, company or legal entity which (i) is owned or controlled by such Party, (ii) owns or controls such Party, or (iii) is under common ownership or control as such Party. As used in the preceding sentence, "control" shall mean the right or ability to control more than fifty percent (50%) of the voting rights of a company or entity.

"**Agreement**" means this Memorandum of Agreement between the Seller and the Buyer.

"**Business Days**" means days on which banks are open in all of the following: New York, the USA, London, the United Kingdom, and Moscow, Russia.

"**Buyer's Location**" means the location where the Buyer mobilizes the Vessel to following delivery.

"**Buyer's Nominated Flag State**" means the Flag State under which Buyer will register the Vessel.

"**Class**" means the Class Notation referred to above.

"**Classification Society**" means the Classification Society referred to above.

"**Conditions Precedent**" has the meaning given in Clause 6 (*Conditions Precedent*).

"**Delivery Date**" shall have the meaning given in Clause 7.

"**Delivery Location**" means Port of Dundee, Dundee, United Kingdom.

"**Delivery Window**" shall have the meaning given in Clause 7.

"**Deposit**" shall have the meaning given in Clause 2 (*Deposit*).

"**Deposit Holder**" has the meaning given in Clause 2 (*Deposit*)

"**Effective Date**" shall have the meaning given in Clause 6.

"**Exclusivity Agreement**" shall mean exclusivity agreement entered into by the Seller and the Buyer on 23 October 2020.

"**Lukoil Development**" shall mean the LUKOIL-KMN Ltd. D33 and D6-yuzhnoye fields in the Baltic Sea offshore Kaliningrad, located on the Russian continental shelf in the south-eastern part of the Baltic Sea in a water depth of 74 meters. The D6-yuzhnoye is within the 12- miles zone of the RF territorial waters. The D33 field is located outside the RF territorial waters in the exclusive economic zone of the Russian Federation

"**Parties**" means the Seller and the Buyer.

"**Permitted Uses**" shall have the meaning given in Clause 4.

"**Prohibited Use**" shall have the meaning given in Clause 4.

"**Seller's Account**" means the following account at Seller's Bank: Ensco Offshore International Company
Account Number: 4945019099
SWIFT: WFBIUS6S
ABA:121000248

"**Seller's Bank**" means: Wells Fargo Bank 420 Montgomery Street
San Francisco, CA 94104

"**In writing**" or "**written**" means a written communication from the Seller to the Buyer or vice versa, prepared and communicated in accordance with the provisions of Clause 28.

"**US Trade Restrictions**" means the restrictive measures taken in the form of a prohibition (restriction) on certain actions, embargoes, moratoriums, including, inter alia, freezing assets, blocking accounts, banning exports, re-export of technologies and equipment, prohibition of transactions with certain persons and / or in certain areas of activity and other restrictions that may be introduced by the Office of Foreign Assets Control of the United States Department of Treasury.

1.    **Purchase Price**

1.1   The consideration to be paid by the Buyer to the Seller for the sale and purchase of the Vessel shall be the amount of USD 25,000,000 (the "**Purchase Price**"), less one per cent commission (1.00%) payable to Arctic Offshore International AS by the Seller as an integral part of the closing procedures.

2.    **Deposit**

2.1   As security for the correct fulfilment of this Agreement, the Buyer will pay a deposit equal to USD 2,500,000 (the "**Deposit**"). Part of the Deposit, being USD 100,000, has already been paid to, and received by, the Seller as the "Advance Payment" under the Exclusivity Agreement.  The remaining part of the Deposit, being USD 2,400,000, shall be paid by the Buyer within five (5) Business Days of the satisfaction or waiver of the final Conditions Precedent as required under Clause 6 and engagement of the Deposit Holder below.  The remaining part of the Deposit shall be placed with Holman Fenwick Willan LLP as escrow agent and deposit holder (the "**Deposit Holder**") to hold the remaining part of the Deposit payable under this Clause 2 and shall be released only in accordance with this Agreement and the deposit agreement to be made between the Buyer, the Seller and the Deposit Holder. Interest on the Deposit, if any, is to be credited to the Buyer. Any fee charged by the Deposit Holder for holding the Deposit shall be borne by the Buyer. The entire amount of the Deposit (together with any interest accrued thereon) will be non-refundable, except as required in the circumstances and pursuant to the provisions of Clause 7, Clause 15 and Clause 16.

3.    **Payment**

3.1   On delivery of the Vessel in accordance with Clause 7.3:

    **(a)**    Buyer agrees to pay to the Seller's Account the balance of the Purchase Price and all other sums payable on delivery by the Buyer to the Seller under this Agreement, free of bank charges; and

    **(b)**    Buyer and Seller shall procure that the Deposit Holder release and pay the remaining amount of the Deposit held by it to the Seller's Account.

Payment of the Purchase Price shall occur in exchange of delivery of the Vessel and documentation referred to in Clause 10.

4.    **Permitted Uses**

4.1   **General**

The Parties agree and acknowledge that this Agreement is entered into by the Buyer with the Buyer's intention of entry into a sale and leaseback (with purchase option) financing transaction for the Vessel with a Russian finance leasing company (where the Buyer will act as lessee and a Russian finance leasing company as lessor). Accordingly, the Buyer shall be entitled to assign this Agreement to its nominated finance leasing company (as set out in Clause 25 below) or otherwise sell or transfer the Vessel to the Russian leasing company and the Russian leasing company shall be entitled to sell or transfer the Vessel to the Buyer or any Affiliate of the Buyer and otherwise pursuant to the terms of that sale and leaseback (with purchase option) financing arrangement, subject always to the use limitations respecting the Vessel as specified and agreed to by the Parties in Clause 4.2.

## 4.2    Permitted Uses

4.2.1    For the purpose of clarity, the Buyer shall ensure that such Russian finance leasing company shall only lease, sell or transfer the Vessel to the Buyer or any Affiliate of the Buyer and subject always to the use limitation respecting the Vessel as specified and agreed to by the Parties in Clause 4.2. (*Permitted uses*).

4.2.2    Subject to Clause 4.1, the Buyer acknowledges that the Seller has agreed to sell the Vessel to the Buyer on the condition that the Vessel will be used by the Buyer for the following purposes:

**(a)**    the Lukoil Development;

**(b)**    other work or projects in territorial waters and continental shelf of the Russian Federation;

**(c)**    other work or projects in territorial waters and continental shelf of Vietnam where JSC "Zarubezhneft" or its Affiliate has a majority interest or is the operator or where Vietsovpetro is the operator,

(together the "**Permitted Uses**").

## 4.3    Transfer of the Vessel

4.3.1    Subject to Clauses 4.1 and 4.3.2, the Buyer shall not be permitted to sell the Vessel to any third party except its Affiliate.

4.3.2    Notwithstanding provisions of Clause 4.3.1, the Buyer may at any time in its own discretion: (i) sell the rig to the Seller for the agreed sum of one United States Dollar, or (ii) scrap the Vessel (or sell the Vessel to be scrapped) providing documentary evidence of scrapping (or sale to be scrapped) to the Seller.

## 5.    Inspection

5.1    The Buyer hereby acknowledges that the sale, purchase and delivery of the Vessel, including the equipment specified in Annexure A will be on an "AS IS, WHERE IS" basis.

5.2    The Seller expressly acknowledges that the Buyer or an Affiliate of the Buyer has entered into or proposes to enter into a drilling contract with Buyer's client for the provision of the Vessel and requires to assess the cost and suitability of upgrading the Vessel for the deployment by Buyer.

5.3     Accordingly, the Seller shall make available to Buyer and shall permit Buyer to carry out any number of inspections and surveys of the Vessel, any equipment on the Vessel, copies of the Vessel's classification records (including previous records), all engineering and construction records of the Vessel, replacement and/or overhaul of the equipment and materials comprising the Vessel and such other records the Buyer may reasonably require.

5.4     The Vessel will be made available for inspection and surveys at the Vessel's current lay-up location and the Buyer and its nominees shall be given free and unrestricted access to all parts of the Vessel and shall be entitled to open up and/or test any part of the Vessel its parts and equipment (whether onshore or offshore) and the Vessel's deck and engine log books shall be made available for examination by the Buyer.

5.5     The Seller shall provide such information as the Buyer may reasonably require for the purposes of advancing its technical and commercial assessment of the Vessel in respect of Buyer's proposed transaction with its client under Clause 5.2.

5.6     The Buyer shall be entitled to share data provided by the Seller, or obtained from its inspection and survey, with the Buyer's engineering, legal, tax or other professional advisers, and with the Buyer's client, provided those advisers and the Buyer's client are bound by an undertaking of confidentiality in broadly similar terms to those set out in Clause22.

5.7     The costs of the inspections, testing, surveys and other actions proposed by the Buyer to be conducted under this Clause 5 shall be for the Buyer's account. The cost of arranging the Seller's personnel or the lay-up contractor to attend inspection under this Clause shall be for the Seller's account.

**6.      Effectiveness and Conditions Precedent**

**6.1      Effectiveness**

This Agreement shall be binding and effective upon execution of this Agreement ("**Effective Date**").

**6.2      Conditions Precedent**

The Agreement to sell and purchase the Vessel on the terms of this Agreement is conditional upon satisfaction of the following conditions (the "**Conditions Precedent**"):

6.2.1    a satisfactory act of inspection relating to the Vessel acceptable to both the Buyer and the Buyer's client; and

6.2.2    receipt by the Buyer of all its necessary corporate approvals required to perform the transactions contemplated by this Agreement;

6.2.3    receipt by the Seller of all its necessary corporate approvals required to perform the transactions contemplated by this Agreement; and

6.2.4    receipt by the Buyer of documentary evidence that the administrators and/or creditors of the Seller (or of its [*Valaris plc*]) has duly approved the sale of the Vessel and the entry into, and performance of the terms of, this Agreement by the Seller.

**6.3      Non-satisfaction**

6.3.1 If the Conditions Precedent are not satisfied or waived by the last day of the Delivery Window, then (subject to any prior extension agreed pursuant to Clause 6.3.2) on or after the last day of the Delivery Window either the Seller or the Buyer may, in its sole discretion by Notice to the other Party, terminate this Agreement and in such case the provisions of Clause 16 (*Mutual Termination*) shall apply.

6.3.2 If the Conditions Precedent have not been satisfied or waived by the last day of the Delivery Window, the Delivery Window may be extended to such other date as may be agreed by the Buyer and the Seller in writing.

## 7. Time and Place of Delivery

7.1 The Vessel will be delivered and taken over by Buyer at a safe and accessible berth at the Delivery Location.

7.2 When the Vessel is physically ready for delivery in accordance with this Agreement, the Seller will give the Buyer a written Notice of Readiness for delivery.

7.3 The Notice of Readiness shall nominate the date of delivery of the Vessel ("**Delivery Date**"), being a Business Day within the period from 25 January 2021 to 29 January 2021 (both inclusive) ("**Delivery Window**") and such Delivery Date being no earlier than ten (10) Business Days after the Buyer's receipt of the Notice of Readiness.  Subject to the terms of this Agreement, the delivery of the Vessel shall take place on the Delivery Date. Delivery of the Vessel shall be effected by the concurrent delivery by each of the Buyer and Seller to each other of a signed Protocol of Delivery and Acceptance in the form set out in Annexure B and such other documents as required under Clause 10.

## 8. Equipment/Spares/Bunkers and other items

8.1 Subject to Clauses 8.2, 8.3 and 8.4, the Seller will deliver the Vessel to the Buyer with the equipment as specified in Annexure A, whether on board or ashore. The Seller is not required to replace spare parts that are taken out of spares and used as replacement prior to delivery, but to the extent the items are replaced prior to delivery, they will be the property of the Buyer after delivery and closing. The Seller represents and warrants the list of Equipment set out in Annexure A is materially accurate, up to date and complete.

8.2 Notwithstanding anything to the contrary contained herein, the Buyer acknowledges that the equipment, parts, supplies and other items specified in Annexure A-1 and any ITAR/US licensed equipment/UK licensed equipment ("Seller's Licensed Equipment") will under no circumstances be considered as part of the sale of the Vessel and are expressly excluded from the sale.

8.3 In addition to the items referenced in Clause 8.2 above, items on board which are on hire and/or owned by third parties are excluded from the sale of the Vessel, including without limitation, any third party communication equipment, such as RigNet or CapRock, or any similar system and any third party free placement equipment (e.g., cementing unit or ROV) (collectively, "Third Party Equipment").

The Seller will remove at its own cost all items specified in Annexure A-1, the Third Party Equipment and the Seller's Licensed Equipment, if any, prior to the delivery of the Vessel. Seller will indemnify Buyer from any claims in connection with Annexure A-1 items, Third Party Equipment and Seller's Licensed Equipment that are not removed prior to delivery.

Notwithstanding the above, in the event that any Third Party Equipment and/or Seller's Licensed Equipment is left onboard the Vessel at the time of delivery, any such equipment will be removed at Seller's own cost and expense at Vessel's arrival at the Buyer's Location.

Upon removal of any equipment from the Vessel, Seller will restore the Vessel (at its own expense) to the same state it was in on 14 October 2020 (the date the Buyer inspected the Vessel). For the sake of clarification, any reinstatement resulting from the removal of 3rd party equipment will be the sole responsibility and cost of the 3rd party as detailed in the agreement with Seller. If Buyer encounters any issue with 3rd parties on this condition post-delivery of the Vessel, Seller will provide details of said agreements to Buyer.

8.4    In addition to the items referenced in Clauses 8.2 and 8.3 above, the Seller has the right to exclude from the sale without compensation: (a) all crockery, plates, cutlery, linen and other articles bearing the Seller's flag or name, (b) library forms, etc., exclusively for use in the Vessel, (c) Captain's, Officers' and Crew's personal belongings including the slop chest, and (d) all assets onboard the Vessel of a proprietary nature including, without limitation, any assets containing proprietary information such as personal and/or laptop computer(s) and computer software, all of which will remain the property of Seller and will not be included in the sale of the Vessel. Notwithstanding the foregoing, any software necessary for the normal operation of the Vessel will not be excluded from the Sale or removed from the Vessel. The Buyer further acknowledges and agrees that the Buyer shall be responsible for procuring the approvals from any such third party supplier for the transfer, reliance upon and use of any of the Equipment, if required.

8.5    The Buyer will take over the remaining bunkers and unused lubricating oils in storage tanks and unbroached drums at no extra cost.

8.6    Buyer acknowledges and agrees that all costs incurred in connection with preparing the Vessel for transport and the transport of the Vessel to the Buyer's Location shall be for the account of Buyer, including without limitation, costs incurred in connection with reactivation and floatation.

9.    **Closing/Delivery**

Documentary closing shall take place, simultaneously with the delivery of Vessel under Clause 7 at Seller's office in London (located at the following address: Valaris, 110 Cannon Street | London | EC4N 6EU, UK or at such other location, or electronically, as the Parties may agree.

10.    **Documentation**

10.1    **_Seller's Delivery Documents._** At the documentary closing, the Seller will deliver to the Buyer the following delivery documents:

(a)    Four (4) executed and notarized Bills of Sale for the Vessel, duly notarially attested to the extent required by the Buyer's Nominated Flag State and Buyer notifies Seller of said requirement within five (5) days after the date of this Agreement (the "**Bill of Sale**"), in substantially the form attached hereto as Annexure D;

(b)    A commercial invoice in three (3) originals for the Purchase Price and signed by a director, officer or other person authorised to represent the Seller;

(c)    A certified copy of a Certificate of Incumbency from the Seller (or the equivalent document in the country of incorporation of the Seller) showing a list of the current directors and officers of the Seller, duly notarized and apostilled;

(d)    A copy of the Certificate of Ownership and Encumbrances dated no more than ten (10) Business Days prior to the date of delivery/closing reflecting that the Vessel is owned by the Seller and is free from mortgages, liens and other encumbrances recorded on the Vessel, with the original of such document to follow as soon as practicable following the closing;

(e)    An original of the most recent Class certificate issued for the Vessel;

(f)    An original of the Vessel's Tonnage Certificate;

(g)    An original of the most recent Vessel's Mobile Offshore Drilling Unit Safety Certificate;

(h)    An original of the Vessel's Certificate of Registry;

(i)    Documents for transfer of the Vessel required by the Liberian registry;

(j)    Properly adopted corporate resolutions or other approvals of the Seller approving the terms of this Agreement and the transaction contemplated herein, duly notarized and apostilled;

(k)    A certificate of good standing of the Seller (or the equivalent document in the country of incorporation of the Seller), duly notarized and apostilled;

(l)    Documents, duly notarized and apostilled, authorizing the Seller's appointed representatives to execute all necessary documents and take all necessary actions in order to sell the Vessel to the Buyer;

(m)    Certificate of incorporation and the memorandum and articles of association of the Seller, duly notarized and apostilled;

(n)    If the Buyer's Nominated Flag State is different from the current flag, a Certificate of Deletion of the Vessel from the Vessel's registry or other official evidence of deletion appropriate to the Vessel's registry, or in the event that the registry does not as a matter of practice issue such documentation immediately, a written undertaking from the Seller to effect deletion from the Vessel's registry forthwith and furnish a certificate or other official evidence of deletion to the Buyer promptly and latest within four (4) weeks after delivery has occurred. If the Buyer maintains the current flag, this certificate will not be required; and

(o)    Any such additional documents as may be reasonably required by the competent authorities for the purpose of registering the Vessel in the name of the Buyer or ensuring the Vessel is in compliance with applicable laws, provided that the Buyer notifies the Seller of any such documents as soon as possible after the date of this Agreement, but in any event, for up to sixty (60) days after delivery.

10.2    At the documentary closing the Parties will execute a Protocol of Delivery and Acceptance confirming the date and time of delivery of the Vessel from the Seller to the Buyer in the form attached hereto as <u>Annexure B</u>.

10.3 **Buyer's Delivery Documents**. At the documentary closing, simultaneously with the delivery of the Seller's Delivery Documents under Clause 10.1, the Buyer will deliver to the Seller the following documents:

  **(a)** A debit advice/swift confirmation from the bank of the Buyer evidencing the irrevocable and unconditional transfer of the balance of the Purchase Price to the Seller's Account (provided; for the avoidance of doubt, delivery of the Vessel shall only be deemed to occur once the balance of the Purchase Price has been received into the Seller's Account).

10.4 The Parties will deliver each to the other draft copies of their delivery documentation not later than three (3) Business Days prior to the Delivery Date, failing which the Delivery Date will be postponed by such period as may be required to accommodate a period of two (2) Business Days for each Party to review the other Party's documents and two (2) Business Days to prepare for closing/delivery after receiving notification of their acceptance of such delivery documentation by each Party.

10.5 Notwithstanding anything herein to the contrary, the Seller shall provide all reasonable assistance to Buyer to obtain appropriate licenses or permits necessary to export the Vessel from the United Kingdom and to clear any customs formalities, including any controlled equipment on the Vessel from the United Kingdom, prior to closing. For the sake of clarity, this includes, but is not limited to, obtaining any customs clearance and export permits in respect of the Vessel and removal of any relevant items of equipment controlled by United States, European Union or United Kingdom regulatory frameworks.

11. **Post Completion**

11.1 The Buyer will, upon delivery of the Vessel, change the name of the Vessel, alter any funnel markings and not employ the names "Valaris," " Ensco", "Pride", "Rowan". "Atwood" or any derivation thereof in its marketing of or reference to or markings on the Vessel unless previously agreed by the Seller. The Buyer will furnish the Seller with written confirmation of the change of markings of the Vessel prior to the Vessel entering any operational activity for the Buyer's intended use, including without limitation, pictures showing the removal of all markings.

11.2 The Buyer will provide the Seller with a copy of the official Certificate of Ownership from the flag state evidencing that the Vessel has been registered in the name of the Buyer within thirty (30) days of the last date of signature to this Agreement.

12. **Authority, Title and Encumbrances**

12.1 Seller hereby represents, covenants and warrants to the Buyer the following:

  (a) as at the Effective Date and on Delivery Date, the Seller is the legal and beneficial owner of the Vessel and the Equipment which belongs to her;

  (b) on Delivery Date, the Vessel and the Equipment will be free of any and all maritime liens, mortgages and all other debts whatsoever, and are not subject to port, state or other administrative detentions or liabilities;

  (c) the Vessel and the Equipment will be the property of the Buyer from and after Delivery Date;

**(d)**   as at the Effective Date and on Delivery Date, the Seller is duly formed and validly existing under the laws of its country of formation and will have full legal right, power and authority to enter into this Agreement and perform their obligations hereunder; and

**(e)**   as at the Effective Date and on Delivery Date, other than the current administration of the Seller, no steps have been taken or proposed in relation to the winding up, bankruptcy, administration, insolvency, dissolution of the Seller or any of its Affiliates.

The Seller hereby undertakes to indemnify the Buyer against all and any loss or consequences following any breach of the above-mentioned representations, covenants and warranties.

12.2   The Buyer hereby represents, covenants and warrants to the Seller the following:

**(a)**   the Buyer is duly formed and validly existing under the laws of its country of formation and has full legal right, power and authority to enter into this Agreement and perform its obligations hereunder;

The Buyer hereby undertakes to indemnify the Seller against all and any loss or consequences following any breach of the abovementioned representations, covenants and warranties.

13.   **Taxes, fees and expenses**

Any taxes (including, but not limited to, VAT), fees and expenses incurred by the Buyer in connection with the purchase and registration of the Vessel in the country of sale and/or Buyer's Nominated Flag State will be for the Buyer's account, whereas similar charges in connection with closing of the Seller's registry will be for the Seller's account.

14.   **Risk and Insurance**

14.1   The Vessel, with everything belonging to it as set forth in <u>Annexure A,</u> will be at the Seller's risk and expense until it is delivered to the Buyer. Subject to the terms and conditions of this Agreement, the Vessel will be delivered and taken over in substantially the same condition as it was at the time of inspection, fair wear and tear excepted.

Notwithstanding anything to the contrary contained in this Agreement, the Seller will not be liable for any deficiency in the description, quality or performance of the Vessel and the Parties agree to exclude the application of all statutory or other implied terms and conditions which might otherwise impose such liability.

14.2   Title to the Vessel and the risk of its loss or damage will pass to the Buyer as from the date and time stated on the Protocol of Delivery and Acceptance, at the Delivery Location  and Buyer shall release, defend, indemnify and hold Seller harmless from all claims, losses, costs and/or actions respecting the use, ownership or possession of the Vessel which may arise after the Delivery Date and Seller shall release, defend, indemnify and hold Buyer harmless from all claims, losses, costs and/or actions arising in relation to the use, ownership or possession of the Vessel prior to the Delivery Date.

15.   **Default**

15.1   Buyer's Default

Should the Deposit not be paid in accordance with Clause 2, Seller has the right to cancel this Agreement in its sole discretion  and neither Party will have any further obligation to the other Party except for obligations under this Agreement that survive termination.

Provided that the Seller is not in breach of its obligations under this Agreement, if the remaining Purchase Price is not paid in accordance with Clause 3, Seller has the right to cancel this Agreement in its sole discretion upon providing no less than fourteen (14) days' notice to Buyer, and provided the remaining Purchase Price remains unpaid as required after such fourteen (14) day period, this Agreement shall automatically terminate in which case the Buyer will forfeit to Seller both the Deposit and any interest earned thereon and neither Party will have any further obligation to the other Party except for obligations under this Agreement that survive termination.

In the event that a transfer of the Vessel occurs in violation of Clause 4, the Buyer acknowledges that this could result in significant harm to the Seller and, because of the difficulty of ascertaining the amount of damage that will be suffered as a result of such breach, the Buyer agrees that, in addition to such other relief as may be proper, the Seller shall be entitled to all types of equitable relief (including, but not limited to, the issuance of an injunction and/or temporary restraining order) entitled to it under law against any breach or threatened breach of Clause 4.

15.2    Seller's Default

Should Seller fail to give Notice of Readiness in accordance with Clause 7.3 or fail to be ready to complete a legal transfer by the last day of the Delivery Window, the Buyer will have the option of cancelling this Agreement. If after Notice of Readiness has been given, but before the Buyer has taken delivery, the Vessel ceases to be physically ready for delivery and is not made physically ready by the last day of the Delivery Window, the Buyer will retain their option to cancel. In the event the Buyer elects to cancel this Agreement, without prejudice to any other right of the Buyer under this Agreement, at law or otherwise, the Seller shall repay, and procure the release of, the total amount of the Deposit to Buyer within five (5) days after notice of such cancellation is received by Seller.

16.    **Mutual Termination**

The Parties may terminate this Agreement if mutually agreed in writing. Upon termination by mutual agreement, the Seller shall immediately repay, and procure the release of, the total amount of the Deposit (or such part of the Deposit paid by the Buyer as at the date of termination) together with interest earned, if any, to the Buyer.

17.    **Buyer's Representatives**

17.1    *Embarkation.* Upon payment of the Deposit in accordance with Clause 2, the Buyer will have the right to embark representatives on board the Vessel upon prior appointment with Seller during normal business hours at the current location of the Vessel at the Buyer's own cost, risk and liability during the period from satisfaction of the following conditions until delivery or earlier termination of this Agreement:

(a)    Signature by the Buyer of the Seller's letter of indemnity in the form set out in <u>Annexure C</u> to this Agreement; and

**(b)**    Provision of written evidence by the Buyer to the Seller that the Buyer has procured suitable and reasonable insurance (third party Protection & Indemnity cover and Longshore and Harbor Workers, or equivalent thereof) (including, subject to the terms of such insurance, waiver of subrogation in favour of the Seller), adequate to cover the indemnities granted by the letter of indemnity, including without limitation, risk of injury to, illness or death of any of the Buyer and its Affiliates', directors, officers, employees, agents, contractors and representatives.

Buyer's representatives shall be accompanied at all times during the familiarisation process by one or more crew members employed by Seller. Seller's crew members shall be available to identify equipment and components. Notwithstanding anything to the contrary herein, in no event shall Seller's crew members' presence during the familiarisation process, including any actions, inactions and/or statements of or by such Seller's crew members, alter, amend or otherwise affect Buyer's purchase and acceptance of Vessel "AS-IS', as provided in Clause 5.

17.2    ***Disembarkation.*** In the event that delivery does not take place for any reason by the last day of the Delivery Window, the Buyer will immediately remove, at the Buyer's cost and expense, any representative that the Buyer has placed on the Vessel. The Seller will have the right to demand the removal of any of the Buyer's representatives for reasonable cause and the Buyer will have the right to replace such representatives at the Buyer's cost and expense.

17.3    ***Non-Interference.*** The Buyer acknowledges that its representatives are permitted to embark on the Vessel for the sole purpose of familiarization with the Vessel and its equipment and systems. The Buyer undertakes to the Seller that the Buyer's representatives will not interfere with the Seller's operations or those of any other person present on the Vessel by authorization of Seller.

18.    **Choice of Law / Arbitration**

18.1    ***Choice of Law.*** This Agreement (and any non-contractual obligations which may arise out of or in connection with it) will be governed by and construed in accordance with laws of England and Wales, without regard to any rules of conflict of laws that would require the application of laws of a different jurisdiction.

18.2    ***Arbitration.*** Any dispute arising out of or in connection with this Agreement, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration administered by the Singapore International Arbitration Centre ("SIAC") in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SIAC Rules") for the time being in force, which rules are deemed to be incorporated by reference in this clause. The seat of the arbitration shall be Singapore. The Tribunal shall consist of three (3) arbitrators. Each Party shall nominate one (1) arbitrator and those individuals shall nominate the third arbitrator who shall serve as the chairman of the arbitration proceeding. The language of the arbitration shall be English.

19.    **No Liability for Consequential Loss**

Neither Party will have any liability to the other Party for any (i) indirect or consequential loss or damages resulting from or arising out of this Agreement or (ii) to the extent not included in (i), for any loss of income or profits or anticipated profit, loss of use, loss of product or business interruption, whether direct or indirect or consequential, and in each case whether or not foreseeable as of the Effective Date of this Agreement.

20.    **Compliance with Laws**

20.1   Each of the Buyer and the Seller warrant and undertake to the other that:

    **(a)**    while performing its obligations under this Agreement  it will not violate or assist or instigate any other individual or legal entity to violate, any applicable law, including without limitation the United Kingdom Bribery Act 2010 and the United States Foreign Corrupt Practices Act;

    **(b)**    it has policies and process in place for its respective officers, employees, consultants, representatives, agents, business partners, joint-venturers and Affiliates in respect of their actions in implementing this Agreement to:

        (i)    be knowledgeable regarding the purpose and provisions of all applicable anticorruption, anti-bribery and anti-money-laundering laws;

        (ii)    comply with the terms of this Agreement, applicable anti-bribery and anti-corruption laws;

        (iii)    not take, or will refrain from taking, any action which would cause either the Buyer or the Seller to be in violation of the terms of this Agreement and applicable anti-bribery and anti-corruption laws;

        (iv)    not be the target of, or owned or subject to control by any country, institution, organization, entity, or person that is the target of economic sanctions and trade restrictions imposed by the United States government, the United Kingdom or the European Union;

        **(v)**    not be debarred or otherwise excluded or declared ineligible to participate in United States government contracts or contracts, grants, or other programs financed in whole or in part by the United States government; **and**

        **(vi)**    not be listed by the United States Department of Commerce or State or included on any list maintained by any government including the governments referenced above as an entity with which the United States persons may not engage in commercial transactions.

20.2   Without limiting the generality or scope of Clause 20.1, the Buyer and Seller further warrant and undertake to each other that:

    (a)    the execution, delivery, and performance of the transaction contemplated under this Agreement will be in compliance with all applicable Export and Import Laws (as defined below) as applicable to each of them respectively;

    (b)    neither the Buyer nor the Seller is or will be a person, company, or entity:

(i)    engaged in prohibited end uses involving nuclear weapons, biological weapons or chemical weapons, or rocket systems or unmanned aerial vehicles intended for the delivery of such weapons within the meaning of the Export Administration Regulations (15 C.F.R. Sections 744.2, 744.3, 744.4 and 744.5);

(ii)    with whom the Seller and/or Buyer (as applicable) is prohibited from dealing or otherwise engaging in the transaction contemplated under this Agreement by any law related to transactions involving countries against which any government of Russia, the United Kingdom ("UK"), or the United States of America ("US"), the Organisation for Economic Cooperation and Development ("OECD"), the European Union or other international organization maintains economic sanctions or embargoes under statute, executive order or regulations;

(iii)    is subject to U.S. Sectoral Sanctions, is on the U.S. Sectoral Sanctions identifications List (SSI List) or is fifty percent (50%) or more owned by any person or company on the SSI list. Buyer and Seller agree that neither the Vessel, nor any part thereof, will be operated in water deeper than 450 feet, in territory above the Arctic Circle, or, in shale formations;

(iv)    appearing on any applicable list of prohibited parties maintained by any of the governments referred to above; or acting or purporting to act, directly or indirectly, on behalf of, or an entity owned or controlled by, any party identified in this paragraph 20.2(b).

**(c)**    it will not export or re-export the Vessel, any part thereof and/or any related equipment (including, without limitation, any accompanying technology, software or other technical data) directly or indirectly without authorizations, licenses, permits or approvals as required by applicable Export and Import Laws as applicable to each of them respectively;

(d)    it will not scrap, demolish, recycle or dispose of, or procure the scrapping, demolishing, recycling or disposal of the Vessel or any part thereof, directly or indirectly, except in an environmentally sound manner and in accordance with applicable laws and regulations as applicable to each of them respectively.

All laws and regulations that govern the restrictions and prohibitions referenced in paragraphs 20.2(b) and (c) will be referred to as Export and Import Laws for purposes of this section.

20.3    Without limiting the generality or scope of this Clause 20, the Buyer and Seller further undertake to each other that while performing the obligations under this Agreement that the Parties, their Affiliates, officers, employees, consultants, representatives, agents, business partners and joint-venturers shall not:

(a)    pay, offer to pay and permit payment of any monetary funds or valuable items, direct or indirect, to any persons for the purpose of affecting these persons or actions or decisions of these persons to get any illegitimate benefits or other illegitimate purposes;

(b)   carry out actions qualified by law applicable to this Agreement as giving or receiving bribe, corrupt payment, and also actions breaching the requirements of applicable law and international acts against legitimization of illegally obtained income (anti-laundering);

(c)   stimulate employees of any Party, including monetary funds, gifts, voluntary performance of any works (services) for them and other manners not mentioned in this Clause that make the employee in a way dependent and aimed at ensuring this employee performs any actions for the benefit of the stimulating Party.

20.4   The obligations set out in Clause 20 will survive any satisfaction, expiration, termination or discharge of any obligations under or pursuant to this Agreement.

21.   **Third Party Rights**

No person who is not a party to this Agreement will have any right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Agreement.

22.   **Confidentiality**

This Agreement and all matters relating to it will be regarded by the Parties as being highly confidential and will not be disclosed to any person who is not a signatory to the Agreement except where such disclosure is required by law or regulation or expressly permitted by Annexure E.

23.   **Entire Agreement**

Each Party acknowledges and agrees that this Agreement constitutes the entire agreement between the Parties and supersedes any prior agreement, understanding, undertaking or arrangement between the Parties relating to the subject matter of this Agreement. Each of the Parties acknowledge that in entering into this Agreement it has not relied on and will have no right or remedy in respect of any statement, representation, assurance or warranty (whether or not made negligently) other than as is expressly set out in this Agreement. Any terms and/or conditions implied into this Agreement by any applicable statute or law are hereby excluded to the extent such exclusion can legally be made.

24.   **Amendments and Modifications**

Any amendment or modification to the terms of this Agreement will be of no force or effect unless the same has been reduced to writing and been signed by the duly authorised signatories of the Parties. Without prejudice to the generality of the foregoing the Parties undertake not to rely on any such amendment or modification unless the same has been made in the manner aforesaid.

25.   **Transfer and Assignment**

Neither Party may transfer, assign or novate any of its rights or obligations under this Agreement, except with the prior written consent of the other Party which consent will not unreasonably be withheld provided always that Buyer shall be entitled to assign this Agreement to its nominated finance leasing company.

26.   **Counterparts**

This Agreement may be executed in any number of counterparts, each of which when executed and delivered will constitute an original, but all of which will together constitute the same instrument.

27. **Survival**

The Parties will continue to be bound by the provisions of this Agreement that reasonably require some action or forbearance after termination.

28. **Notices**

28.1 Any notice, demand or other communication to be given by or on behalf of the Parties hereto pursuant to this Agreement will be in writing and sent by first class pre-paid airmail letter post, telefax or email or be delivered by hand (including by courier delivery against receipt) to the address or coordinates specified below:

(a) in the case of the Seller, to:

Address: Valaris, 110 Cannon Street | London | EC4N 6EU, UK

to the attention of Derek Sangster

E-mail: Derek.Sangster@valaris.com

Tel: +41 41 562 50 51

Fax: [●]

With a copy to:

[Valaris]

(b) in the case of the Buyer, to:

Address: 33/3 Akademika Knipovicha Street, Murmansk, 183039, Russia

to the attention of Michail Popov;

E-mail: amngr@amngr.ru, popov.m@amngr.ru;

Tel: (8152) 55-20-00;

Fax: (8152) 44-14-91.

28.2 The Parties will promptly notify each other in the manner provided in this Clause 28 of any change in the coordinates set out above 28.1. Any such communication sent as provided above will be deemed to have been received by the Party to whom it is addressed:

(a) if delivered by hand, on delivery against signed receipt;

(b) if sent by post, two (2) Business Days following posting;

(c) if sent by telefax, on completion of dispatch if the sender receives a transmission report on which the result is recorded as "OK" or equivalent;

(d) if sent by email, when transmission has been effected, the burden of proof of which will at all times and in all circumstances be borne by the sender,

provided that such notice is delivered or sent between the hours of 09:00 and 17:30 local time on a Business Day in the place of receipt, and otherwise will be deemed to be received at the next following hour of 09:00 on a Business Day.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed by their duly authorised signatories.

For the Seller:                                       For the Buyer:

Name: _____       Name:   Mikhail A. Popov

Title: _____       Title:       General Director

**ANNEXURE A**

1.1    (Seller to attach the Standard Format Equipment List Excel file titled "Valaris 101 Equipment List.xlsx" sent by Valaris to <u>lyng@arctic.com</u> electronically via email on 29.09.2020

**ANNEXURE A-1**

[Items excluded]


**ANNEXURE B**

(Form of Protocol of Delivery and Acceptance)

Protocol of Delivery and Acceptance

Date:

Time:

Place: [latitude and longitude]

Pursuant to the Memorandum of Agreement dated_____ , (the "MOA") made between **Ensco Offshore International Company**, a Cayman Island limited liability company (the "**Seller**") and **JSC "Arktikmorneftegazrazvedka**", a company incorporated in and under the laws of Russia (the "**Buyer**") the Seller deliver Ensco 101 (the "Vessel") to the Buyer, and the Buyer accept delivery of the Vessel on the date and at the location referred to in this Protocol.

The Parties have come to the agreement that together with the Vessel the following have been delivered by the Seller and accepted by the Buyer Rig equipment and drilling equipment in accordance with Annexure A of the MOA.

This Protocol of Delivery and Acceptance is governed by and shall be construed in accordance with the laws of England.

The Protocol of Delivery and Acceptance may be executed in two (2) counterparts, each of which shall be an original but which (both) shall together constitute one and the same instrument.



**(Seller)** _____ **(Buyer)**


By: _____     By: _____

Name: _____     Name: _____

Title: _____     Title: _____

Date:                              Date:

## ANNEXURE C

## (Form Release and Waiver)

## <u>RELEASE, WAIVER AND INDEMNITY</u>

This Release, Waiver and Indemnity is made as of the date indicated below by the person whose name and signature appear below ("the Undersigned").

WHEREAS, the Undersigned is an employee or representative of _____, or one of its affiliates, and desires to enter onto a certain rig owned by ENSCO Worldwide GmbH, and/or its affiliates ("Company"), specifically the ENSCO 101 ("the Rig"), for the purpose of inspecting the Rig in connection with potential purchase of such Rig(s) (the "Purpose"); and.

WHEREAS, Company has agreed to allow the Undersigned limited access to the Rig as an accommodation for the Undersigned's benefit and for the limited Purpose stated above;

NOW THEREFORE, in consideration for being allowed to enter onto the Rig, together with other good and valuable consideration, receipt and sufficiency of which the Undersigned hereby acknowledges, the Undersigned executes this Release, Waiver and Indemnity, as follows:

1. The Undersigned for itself, individually, and for its employer or company represented, collectively, hereby releases, discharges, indemnifies and holds forever harmless (i) Company and all affiliates or subsidiaries, as well as its officers, directors, shareholders, employees, agents, representatives, joint-venturers, partners, and insurers, (ii) the Rig in any *in rem* capacity, and (iii) the owner(s), operator(s), and manager(s) of any premises on or adjacent to which the Rig may be located and which the Undersigned must enter to access the Rig, together with its affiliates, subsidiaries, officers, directors, shareholders, employees, agents, and representatives, from and against any and all injury or death to persons, or loss or damage to property of any kind or nature that may be sustained to the Undersigned's person or property in, around and/or on the Rig, including but not limited to its appurtenances and equipment, and all means of ingress and egress from the Rig, regardless of cause. <u>THIS RELEASE EXPRESSLY INCLUDES AND EXTENDS TO ANY INJURY OR DEATH TO PERSONS AND LOSS OR DAMAGE TO PROPERTY WHICH THE UNDERSIGNED MAY SUSTAIN AS A RESULT OF COMPANY'S, OR COMPANY'S PERSONNEL'S BREACH OF ANY DUTY (WHETHER STATUTORY OR OTHERWISE), STRICT LIABILITY, ANY THEORY OR TORT, REGULATORY OR STATUTORY LIABILITY, PRODUCTS LIABILITY, NEGLIGENCE (WHETHER SOLE, CONCURRENT, CONTRIBUTORY OR GROSS, AND WHETHER ACTIVE OR PASSIVE), OR WILLFUL MISCONDUCT, OR ANY UNSEAWORTHY CONDITION OF A VESSEL OR ANY HAZARDOUS CONDITION ON OR ABOUT THE RIG.</u>

2. The Undersigned for itself individually and for its employer or company represented further expressly and unconditionally waives any and all rights, duties, or obligations which he or she might otherwise have, or which Company or its personnel might otherwise owe, whether at common law, or by statute, regulation or other law, with respect to

the disclosure, removal, or protection against hazards or dangerous conditions or activities on or about the Rig.

3.      The Undersigned expressly acknowledges, understands, and agrees that conditions may exist or operations may be undertaken on or about the Rig which may pose a risk of serious injury, damage, or death to his or her person or property, and that while on or about the Rig the Undersigned may come into contact with or be exposed to such risks and may sustain harm or loss, including death, as a result.  Nevertheless, it is the Undersigned's express intention to release Company from any and all claims, suits, demands, or causes of action that he or she might otherwise have against Company arising therefrom, and to waive any rights, duties, or obligations which might otherwise exist with respect thereto.

4.      The Undersigned expressly acknowledges, understands, and agrees that he or she is merely a licensee on the Rig, and further, that regardless of his or her legal status as "licensee" or otherwise, this Release, Waiver and Indemnity shall extend and apply in lieu of any rights which he or she might otherwise have, and any duties or obligations which Company might otherwise owe, whether by virtue of common law, statute, regulation, or other law.

5.      The Undersigned expressly acknowledges, understands, and agrees that Company makes no representations or warranties, express or implied, regarding the condition of the Rig or the operations conducted thereon, nor with respect to the safety or well-being of the Undersigned while present on the Rig, nor with respect to any dangers or hazards on or about the Rig, or the absence thereof.

6.      The Undersigned expressly warrants and represents that he or she has read and understood this Release, Waiver and Indemnity, and that he or she has executed same voluntarily and without duress, for the consideration and purposes stated; and further, that in executing this Release, Waiver and Indemnity he or she has not relied on any representations or warranties by Company, express, implied, or otherwise, except as expressly set out herein.

7.      This Release, Waiver and Indemnity shall be binding on the Undersigned and the employer or company represented and shall inure to the benefit of Company and its personnel, together with their respective heirs, successors, and assigns.

8.      This Release, Waiver and Indemnity shall be governed by and construed in accordance with the laws of England and Wales, without giving effect to the choice of law rules thereof that would result in the application of the law of another jurisdiction.  Each party hereby irrevocably submits to the (i) exclusive jurisdiction of the English courts, for purposes of any suit, action or other proceeding arising out of this Release, Waiver and Indemnity or of the Purpose contemplated hereby, that is brought by or against the other party, and (ii) the venue of such suit, action or proceeding in such courts in England. Each party waives the right to trial by jury.

EXECUTED this _____ day of _____, 2020.

By:

_____

Printed                          Name:

_____

Title:

_____

Representing:

_____

WITNESS

By: _____
Printed Name: _____

WITNESS

By: _____
Printed Name: _____

**ANNEXURE D**

(Form of Bill of Sale)

**BILL OF SALE**

**KNOWN ALL MEN** by these presents, that:

**Ensco Offshore International Company**, a Cayman Island limited liability company (the "Seller"), being the sole owner of the rig known as Ensco 101 (the "Vessel"), for good and valuable consideration as set forth in the Memorandum of Agreement between the parties dated _____, and any amendments thereto (collectively the "Agreement"), the receipt and adequacy of which are hereby acknowledged,

does hereby transfer all its rights, title and interest in and to the Vessel unto:

**JSC "Arktikmorneftegazrazvedka"**, a company incorporated in and under the laws of Russia (the "Buyer").

Seller acknowledges that the Vessel is free from all registered mortgages, encumbrances and maritime liens.  Buyer acknowledges that Seller makes no representation or warranty with respect to the assets being conveyed hereby except as specifically set forth in the Agreement.

Name of Vessel:  Ensco 101
Official Number:  11107
IMO:              8764779
Port of Registry:  Monrovia

IN WITNESS WHEREOF, the Seller causes this Bill of Sale to be duly executed as of the _____ day of _____, 20__.

**SELLER**

By: _____

Name: _____

Title: _____

ACKNOWLEDGED:

**BUYER**

By: _____

Name: _____

Title: _____

# ANNEXURE E

# (Confidentiality – Non Disclosure Agreement)

### MUTUAL CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

THIS MUTUAL CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT (the "**Agreement**"), entered into this 28 day of September, 2020, (the "**Effective Date**") by and between

(1) **Ensco Offshore International Company, a Valaris** company organized under the laws of the Cayman Islands whose registered office is at ~~ONE CAPITAL PLACE~~ KY1-1110 (hereinafter referred to as "Valaris"); and

(2) **Joint Stock Company Artikmorneftegazrazvedka**, a AMNGR company, having its office at Murmansk, Russia (the "**Counterparty**").

Valaris and the Counterparty may be referred to individually as a "**Party**" or collectively as the "**Parties**" and the owner of any such Confidential Information shall be referred to herein as the "**Disclosing Party**" and the receiver of the Disclosing Party's Confidential Information shall be referred to herein as the "**Receiving Party**".

WHEREAS Valaris and the Counterparty desire to share certain Confidential Information for the Permitted Purpose and wish to enter into this Agreement to establish the terms of disclosure, the confidentiality and use obligations and restrictions with respect to such Confidential Information.

NOW, THEREFORE, for in consideration of the mutual covenants and conditions contained herein, the Parties hereby agree as follows:

1. _Definitions_. The following defined terms shall apply in this Agreement.

   "**Affiliates**" with respect to either Party shall mean any entity, including without limitation, corporation, company, partnership, limited liability company or group, that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such Party. For purposes of this definition, the term "control" (including with the correlative meanings, the terms "controlled by" and "under common control with") means the possession directly or indirectly of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, by trust, management agreement, contract or otherwise. This definition includes those entities in which Company maintains such control but owns less than fifty percent (50%) interest.

   "**Confidential Information**" means (i) the terms and existence of this Agreement; (ii) the fact that discussions are taking place between the Parties in respect of the Permitted Purpose; (iii) the Permitted Purpose; (iv) all information communicated to or to be obtained by the Receiving Party, directly or indirectly from the Disclosing Party (either through itself or its Affiliates and its and their representatives) in connection with the Permitted Purpose whether prior to or after execution of this Agreement and whether in written, electronic or any other form or medium in which such information may be kept, or in the course of any oral or written communications, regarding the business and technology of the Disclosing Party, including without limitation, information regarding equipment, processes, services, working models, drawings, samples, prototypes, research, reports, development, inventions, marketing and business plans, models, analyses, compilations, interpretations, data, studies, reports, contractual and financial information, technical information; and (v) material derived or generated from the inspection or evaluation of any of the above, including notes, summaries, interpolations or synthesis.

   "**Permitted Purpose**" means the evaluation of one or more rigs by a Party or its Affiliates.

2. _Obligations of Confidentiality_. The Disclosing Party is willing, in accordance with the terms and conditions of this Agreement, to disclose to the Receiving Party Confidential Information for the Permitted Purpose, and the Receiving Party shall:

    (i)       keep the Confidential Information confidential and shall not publish or otherwise disclose the Confidential Information to anyone in any manner whatsoever, including by means of photocopy or reproduction or viewing, except with the Disclosing Party's prior written consent or as otherwise specifically provided by this Agreement;

    (ii)     not use, directly or indirectly, the Confidential Information for any purpose other than the Permitted Purpose; and

    (iii)    not duplicate the Confidential Information, except as reasonably necessary for the Permitted Purpose.

3.    Permitted Disclosures. The Receiving Party may disclose Confidential Information without the prior written consent of the Disclosing Party only to the extent that immediately prior to such disclosure the Confidential Information:

    (i)       is already known to the Receiving Party as of the date of disclosure pursuant to this Agreement; or

    (ii)     is already in possession of the public or becomes available to the public other than through an act of the Receiving Party; or

    (iii)    is available to the Receiving Party or its Affiliates having become so available through any third party which, to the best of the Receiving Party's knowledge, has the right to disclose such information at the time that it is acquired by the Receiving Party or its Affiliate; or

    (iv)    is acquired or developed independently by the Receiving Party through unrelated internal efforts; or

    (v)     is required to be disclosed by law or any government, statutory, judiciary or regulatory body; provided that the Receiving Party (1) gives prompt written notice to the Disclosing Party so that the Disclosing Party may seek a protective order or other appropriate remedy, (2) only discloses the portion of such Confidential Information that the counsel for the Receiving Parties advises is legally required to be disclosed, and (3) reasonably cooperates to the extent reasonable with the Disclosing Party in any attempt to obtain any protective order or other appropriate remedy.

4.    Disclosure to Representatives. The Receiving Party may disclose the Confidential Information without the Disclosing Party's prior written consent to: (i) any Affiliates, (ii) employees, consultants, agents, directors and officers of the Receiving Party and its Affiliates, (iii) any insurer, insurance broker or professional adviser; but only for the Permitted Purpose and provided that the Receiving Party shall ensure that any such persons are bound to terms of confidentiality no less onerous than those in this Agreement.

5.    Ownership and Storage. The Confidential Information shall remain the property of the Disclosing Party, and the Disclosing Party may demand the return thereof at any time upon giving written notice to the Receiving Party. The Receiving Party shall exercise all due care in ensuring the proper and secure storage of the Confidential Information and shall only make copies of the Confidential Information to the extent necessary for the Permitted Purpose.

6.    No License. Nothing contained herein is intended to confer upon the Receiving Party, either expressly, by implication, by estoppel, or otherwise, any license or right to any Confidential Information whatsoever, including without limitation, intellectual property rights (patents, trademarks, copyrights, trade secrets or any other intellectual property right) owned or controlled by the Disclosing Party.

7. <u>Return</u>. Within thirty (30) days of receipt of a notice, the Receiving Party shall return all of the original Confidential Information provided hereunder and shall destroy all copies, reproductions or other notes, memorandum or other documents that contain or reflect the Confidential Information in its possession or control. Notwithstanding the return or destruction of the Confidential Information, the Receiving Party shall continue to be bound by the obligations of confidentiality, non-use and non-disclosure in this Agreement.

8. <u>Termination</u>. This Agreement shall terminate upon either (i) the Parties entering into an agreement with confidentiality provisions covering the Confidential Information, (ii) written agreement of the Parties, or (iii) five (5) years from the Effective Date. Each Party's rights and obligations under this Agreement shall survive any expiration or termination of this Agreement for a period five (5) years from the date of such expiration or termination, even after the return or destruction of Confidential Information by the Receiving Party.

9. <u>Non-Solicitation</u>. The Receiving Party shall not, and shall cause that none of its Affiliates shall, for a period of twelve (12) months after the date of this Agreement, without the prior written agreement of Disclosing Party, directly or indirectly actively entice, solicit, or offer to employ or enter into a contract for the services of, any individual who was, at any time during the negotiations relating to the Permitted Purpose, an employee of Disclosing Party or its Affiliates interacting with Receiving Party in connection with the Permitted Purpose. The provisions of this Section 9 are considered fair and reasonable by the Parties.

10. <u>Non-Infringement</u>. The Disclosing Party represents and warrants that it has the right to disclose the Confidential Information as contemplated herein without breaching any obligations of confidentiality to third parties or infringing upon the intellectual property rights of third parties. Disclosing Party agrees to defend, indemnify and hold harmless the Receiving Party from any and all claims arising out of a breach of this representation and warranty. This indemnity obligation shall survive the expiration of this Agreement.

11. <u>No Representations</u>. The Disclosing Party is providing its information on as "as-is" basis and makes no representations or warranties, express or implied, as to the accuracy, quality or completeness of its information and only specific representations and warranties made in a definitive agreement, when and if same is executed by the Parties, shall have legal effect. The Receiving Party agrees that it shall not rely upon the Disclosing Party's information without satisfying itself as to the accuracy and completeness of such information by making independent verification thereof.

12. <u>Governing Law and Remedies</u>. This Agreement shall be governed by and interpreted in accordance with the laws of England and Wales, without regard to the choice of law principles that would result in the application of the law of another jurisdiction. The Parties acknowledge that money damages may not be an adequate remedy for any breach of this Agreement due to the irreparable harm that may result from the unauthorized disclosure of Confidential Information. As a result, the Disclosing Party shall be entitled to seek specific performance, an injunction or other equitable relief if a Receiving Party breaches or threatens to breach the confidentiality, non-use or non-disclosure provisions of this Agreement. Except for actions seeking equitable relief, each Party agrees that the courts sitting in England and Wales shall have jurisdiction over any dispute arising out of or relating to this Agreement which cannot be amicably resolved by the Parties, including any question regarding its existence, validity or termination, and each Party hereby irrevocably commits to the jurisdiction of such courts and to the venue of any such action in England and Wales. A dispute shall be deemed to have arisen when either Party notifies the other Party in writing to that effect. No failure or delay by the Disclosing Party in exercising any of its rights or pursuing any remedies available to Disclosing Party hereunder or at law or in equity shall in any way constitute a waiver or prohibition of such rights and remedies in the event of a breach of this Agreement.

13. <u>No Obligation</u>. Neither this Agreement, nor the disclosure of Confidential Information under this Agreement or ongoing discussions and correspondence between the Parties, shall constitute or imply any commitment or binding obligation between the Parties.

14. <u>Entire Agreement</u>. This Agreement comprises the full and complete agreement of the Parties with respect to the Confidential Information and supersedes and replaces all prior communications, understandings and agreements between the Parties, with respect thereto, whether written or oral, expressed or implied. No amendments, changes or modifications to this Agreement shall be valid except if the same are in writing and signed by a duly authorized representative of each of the Parties.

15. <u>Notices</u>. All notices given under this Agreement must be in writing and must be delivered in person or by overnight courier with confirmed delivery to the Parties at the addresses given in the preamble to this Agreement, with attention to the signatories to this Agreement.

16. <u>Successors</u>. This Agreement shall be binding upon the Parties hereto and their respective successors and permitted assigns.

17. <u>No Trading</u>. The Parties acknowledge that federal and state securities laws prohibit trading in a company's securities on the basis of material non-public information and that certain of the Confidential Information may constitute such material non-public information. The Parties agree that each of them shall not and they shall cause their respective Affiliates, employees, consultants, agents, directors, officers and advisors to not engage in any transaction involving a company's securities based on such material non-public information in violation of federal and/or state securities laws.

18. <u>Assignment</u>. Neither Party may assign any of its rights hereunder without the prior written consent of the other Party. Any purported assignment in violation of this Section shall be null and void. No assignment shall relieve the assigning Party of any of its obligations hereunder. This Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

19. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

IN WITNESS WHEREOF, the duly authorized representatives of the Parties have caused this Agreement to be executed as of the Effective Date.

ENSCO OFFSHORE INTERNATIONAL COMPANY:

JSC ARTIKMORNEFTEGAZRAZVEDKA COUNTERPARTY:

By: DEREK SANGSTER

By: Mikhail Popov

Title: PRESIDNT + DIRECTOR

Title: General Director